**Jack KEMP, Secretary of the Department of Housing and Urban Development, Plaintiff,**

v.

**COST CONTROL MARKETING AND SALES MANAGEMENT OF VIRGINIA, INC., et al., Defendants.**

Civ. A. No. 89–0042–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

April 22, 1992.

Margaret S. Hewing, Robert S. Whitman and Mark W. Battem, Trial Atty., Federal Program Branch, Civ. Div., Rebecca J. Holtz, Sarah E. Canzoneri, Dept. of HUD, Washington, D.C., U.S. Atty., Roanoke, Va., for plaintiff.

Francis T. Eck, Thomas P. Collins, Eck, Lewis, Anderson & Collins, Richmond, Va., Marshall E. Anders, Rosenblum & Anders, P.C., Stroudsburg, Pa., James W. Cameron, Deputy Agent, New York City, for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This civil action was brought by the United States Department of Housing and Urban Development ("HUD") against Cost Control Marketing and Sales Management of Virginia ("CCMV") and several of its officers and sales agents ("the individual defendants") to enforce the Interstate Land Sales Full Disclosure Act ("the Act"). 15 U.S.C. § 1701 *et seq.* (1982). Summary judgment has been granted against the individual defendants for violating the registration and disclosure requirements of the Act, and the so-called "anti-fraud" provisions of the Act. The court must now craft an interim judgment order.

The facts in this case are no longer in dispute. CCMV is a Virginia corporation engaged in the purchase, marketing, and sale of lots of land at Lake Monticello, in Fluvanna County, Virginia. HUD filed this action against CCMV, and the individual defendants, William Peterson, President of CCMV; Arthur Kujawski, Vice President of CCMV; Richard Costenbader, Chief Executive Officer of CCMV; James Marley, Secretary and Treasurer of CCMV; and Thornton Byron, a sales agent of CCMV. All of the defendants are "developers" as that word is defined at 15 U.S.C. § 1701(5). *See Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir.1991). Their activities therefore came within the purview of the Act.

The Complaint alleged and this court found on a motion for partial summary judgment as to Counts I and II of the Complaint, that as of January 1, 1987, CCMV and the individual defendants had violated the "sales practices" requirements of the Act by selling lots without filing a statement of record with HUD's Office of Interstate Land Sales, *see* 15 U.S.C. § 1703(a)(1)(A), and without providing purchasers with statutorily required property reports. *See id.* § 1703(a)(1)(B). In October 1991, this court also granted partial summary judgment against the individual defendants as to Count III for violating the "anti-fraud provisions" of the Act, *see* 15 U.S.C. § 1703(a)(2)(B) and (C), and violating the Act's revocation requirements and their implementing regulations. *See id.* § 1703(b) and (c); 24 C.F.R. § 1715.2, and .3. The latter grant of partial summary judgment was based entirely upon the absence of any material dispute as to the claims in Counts I and II. In other words, no additional disputes as to material fact were resolved. Because CCMV is in bankruptcy, this court did not enter judgment against it with respect to Count III.

HUD has proffered to the court a proposed judgment order. In light of the findings supporting this court's grants of summary judgment, the proposed order's permanent injunction against further sales

in violation of the Act is appropriate. Without a permanent injunction, a reasonable likelihood exists that further violations would occur.

First, the violations alleged were not isolated or technical violations. Instead, they occurred in hundreds of transactions, and it is possible that absent the reporting violations the defendants would not have been able to sell the lots at Lake Monticello for inflated prices. *See infra* discussion at 1278–79. In short, the violations constitute part of a pattern of conduct that suggests a strong propensity to repeat itself in the absence of a permanent injunction.

■ Second, the defendants appear to be absolutely unrepentant about their acts in violation of the statute. The court recognizes that a party's lack of remorse generally is not a proper factor for consideration in determining whether to impose a permanent injunction. However, the individual defendants twice in this case were certified in contempt by a magistrate judge. *See* Certification of Contempt (Jun. 29, 1990); Report & Recommendation (Feb. 7, 1991).[1] Although those rulings by the magistrate judge were mooted by the most recent grant of partial summary judgment, the court finds evidence in those decisions that the individual defendants do not feel bound by the orders of this court (or by the law). As such, consideration of the individual defendants' attitude towards these proceedings is a proper factor for consideration in imposing a permanent injunction. *S.E.C. v. First City Financial Corp., Ltd.,* 890 F.2d 1215, 1229 (D.C.Cir.1989). In light of these factors, a permanent injunction is appropriate and will issue in a separate order.

■ The court also does not question the appropriateness of a permanent injunction barring the defendants from enforcing any notes or other obligations issued by purchasers and held by defendants. This latter injunction is imposed for the reasons stated below in support of a remedy of restitution. Where restitution is a proper remedy, a court may properly exercise its equitable powers to enjoin the further unjust enrichment of the party who has committed the wrong. *See Peterson,* 940 F.2d at 114; *S.E.C. v. Manor Nursing Centers,* 458 F.2d 1082, 1103–04 (2d Cir.1972);[2] Restatement of the Law, Restitution, § 4 (1937). No evidence has yet been presented to establish that the defendants still hold the notes of purchasers, but if they do, setting aside those obligations will accomplish the purpose of terminating a continuing wrong.

A more difficult aspect of the proposed judgment order is its recommendation that the court order the individual defendants to make restitution of monies paid in connection with purchases of lots at Lake Monticello in an amount based upon the difference between the sale prices of the lots and the assessed value of the lots. *See Manor Nursing Centers,* 458 F.2d at 1104 (restitution is excess of what purchasers paid over value of what they received). The proposed order asks the court to establish a trust fund to receive such monies, and to appoint a trustee to disburse the monies to purchasers of lots in an amount proportional to the price of the individual purchaser's lot relative to the total price of the lots of all purchasers.[3] The order would also impose joint and several liability on the five

---

1. This Court on February 14, 1990 entered an injunction *inter alia* enjoining the individuals from transferring or disposing of their personal monies or assets except for the payment of reasonable living expenses, and required them to make financial reports to the magistrate judge on a monthly basis. The contempt findings arose from the individual defendants' failures to obey the asset freeze, and gave the Court cause for grave concern that the individual defendants had dissipated their assets by spending amounts far in excess of their personal incomes.

2. The Act is patterned after the federal securities laws. *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 778, 96 S.Ct. 2430, 2433, 49 L.Ed.2d 205 (1976). Therefore SEC cases have provided the parties and the court with useful precedent for the resolution of the questions at hand.

3. This component of the proposed order is within the power of the Court to order. *See Manor Nursing Centers,* 458 F.2d at 1105 (upholding without explicit statutory authority appointment of trustee necessary to effectuate purposes of securities laws).

individual defendants for an initial restitution payment of $100,000. Finally, upon this court's subsequent approval of a final judgment amount, all of the defendants would then become jointly and severally liable on a continuing basis to pay the final amount.

The individual defendants concede that restitution is a remedy available to HUD pursuant to 15 U.S.C. § 1714, and that disgorgement is a form of restitution. (Obj. to Prop.Order at 3). The defendants argue, however, that the remedy of disgorgement is only available where fraud is proven.[4] This position is incorrect for a number of reasons. First, the Act does not distinguish between the remedies available for violations of § 1703(a)(1) (sales practices provisions), and § 1702(a)(2) (anti-fraud provisions). Second, this court has already granted partial summary judgment against the individual defendants for violating the anti-fraud provisions of the act on the basis of their violations of registration and reporting requirements. *See S.E.C. v. Benson*, 657 F.Supp. 1122, 1130 (S.D.N.Y.1987) (filing registration statement without disclosing a fact material to making the statement not misleading violates anti-fraud provision of Securities Act of 1933, 15 U.S.C. § 77q(a)). Third, "[i]t is for the federal courts to adjust their remedies so as to grant the necessary relief where federally secured rights are invaded." *J.I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). This court has no doubt that it may properly order the defendants to disgorge the benefits they received as a result of their violations of the Act. It remains, however, for this court to consider in some detail certain problems raised by the imposition of an order of restitution and disgorgement.

## I.

■ The first such problem relates to HUD's proposal that the individual defendants be required to make an initial restitution payment of $100,000. HUD has sought to demonstrate that $100,000 is an appropriate initial restitution by establishing that the ultimate liability of the defendants will be much greater than $100,000. HUD makes its proof by estimating the total number of lots sold in violation of the Act, their value, and their purchase prices. This evidence was presented in the form of a declaration by Roger G. Henderson, Director of the Interstate Land Sales Registration Division of HUD. According to the declaration, the defendants' own records indicate that at least 466 sales of lots were completed by the defendants. Two hundred and fifty eight of the 466 purchasers of those lots have responded to HUD questionnaires. The purchasers responses form the basis of the information provided in the Henderson declaration.

The declaration discloses that the average assessed value of the 258 lots was $7,962. This information came from the Fluvanna County Commissioner of Revenue, whose tax assessments represent 100% of the assessed values of the lots. Virginia by statute requires that tax assessments of real estate be made at 100 percent of fair market value. Va.Ann.Code § 58.1–3201. The court therefore considers the county assessments to establish with a high degree of certainty the fair market value of the properties.[5]

Multiplying the average assessed value of $7,962 by the 466 lots yields a preliminary estimate that the total assessed value

---

4. The Fourth Circuit has ruled in this case that an asset freeze must be supported by "a showing of fraud, mismanagement, or other reason to believe that ... absent the freeze order, the assets would be depleted or otherwise become unavailable." *Peterson,* 940 F.2d at 114. It appears to this court that the Fourth Circuit directed its attention only to asset freezes, not to disgorgement. Nevertheless, even if that language is applicable to a disgorgement, the court finds in the magistrate's contempt certifications ample reason to doubt that the assets of the

individual defendants will be available to satisfy a judgment of restitution.

5. For purposes of the interim order, this degree of certainty is sufficient. If at a later proceeding the defendants are able to present to the court persuasive evidence that the assessments do not represent actual market value, the court will consider that evidence in arriving at a final judgment amount.

of the 466 lots was $3,710,480. The actual assessed value of the lots purchased by the 258 questionnaire respondents was $2,054,300.

All 466 properties were sold between 1987 and 1989 in unimproved condition. The average price of the lots when sold by CCMV was $26,520. That is $18,558 more than the average assessed value of $7,962. Multiplying $26,520 by the 466 lots yields a preliminary estimate that the sum of the sale prices of the lots was $12,358,528. The difference between the $12,358,528 estimated total sale price for the 466 lots and the $3,710,420 estimated total assessed value is $8,648,048. More conservatively, the difference between the $6,842,275 total sale price for the 258 lots whose prices are known, and their $2,054,300 assessed value is $4,787,975.

HUD claims that because $8,648,048 is an approximation of the gross profit the defendants received by virtue of their violations of the Acts provisions, it is not too much to require the individual defendants to make an initial restitution payment of $100,000 to the trust fund while the precise amount of restitution for which the defendants will be liable is finally determined by the court. The court agrees. In light of the certifications of contempt by the magistrate judge, and the likelihood that the individual defendants' ultimate liability will be substantially greater than $100,000, this court considers $100,000 to be a modest preliminary payment and a reasonable assurance that some restitution, (however inadequate) is forthcoming from the individual defendants.

## II.

■■■ The court has taken quite seriously the individual defendant's argument that disgorgement is a proper remedy only if proceeds of the illegal transactions can be shown to have passed through to them. Restitution is an equitable remedy consisting of a return to the innocent party of the dollar value of any benefit he conferred upon the other party. *See* Restatement of the Law, Restitution, § 1, comment e (1937). The court therefore may only recover from the individual defendants restitution in an amount that can be shown to be equal to the benefit they received from CCMV as a result of the violations of the Act. *See Manor Nursing Centers,* 458 F.2d at 1104, *S.E.C. v. Allen & Associates, Inc.,* 386 F.Supp. 866, 881 (S.D.Fla.1974).

The proceeds of the land sales were not paid directly to the individual defendants; rather they passed through CCMV before reaching the individual defendants. CCMV now is in bankruptcy and will not therefore be subject to the interim judgment order accompanying this opinion. Ultimately, the evidence may show that the majority of chattel paper generated by the sales of lots at Lake Monticello was sold by CCMV to Northeastern Bank ("Northeastern").[6] The monies paid to CCMV by Northeastern in exchange for the obligations were probably used in part to satisfy CCMV's outstanding obligations for the lots it held in inventory, while the remainder was either retained or invested by CCMV, or paid as compensation to officers and employees of the corporation including the five individual defendants.

Beyond common sense, the history of this case suggests that a substantial amount of profits passed to the individual defendants as a result of their violations. Even after this court imposed its preliminary injunction freezing the individual defendants' assets, the magistrate judge recommended that this court find them in contempt of court because their expenses went "beyond the pale of reasonableness and constitute[d] a pattern of expenditure that far exceeds the income of each defendant." Report & Recommendation (Feb. 7, 1991). The purported gift by defendant James

---

6. Northeastern is a defendant in a separate class action before this Court alleging that it aided and abetted CCMV in its violations of the Act. *Bailey v. Cost Control Marketing and Sales Management of Virginia, Inc.,* 132 F.R.D. 435 (W.D.Va.1990). That fact, however, and any potential recovery the class may have from Northeastern is irrelevant to this suit. The individual defendants are not co-defendants in that suit and there is no possibility of a double recovery against them.

Marley to his son of $300,000 is but one egregious example. *See* Report & Recommendation (Oct. 16, 1990). The fact that defendants could conduct their financial affairs with so little restraint suggests that before the commencement of this action the individual defendants received sizeable profits from the violations.

The Court of Appeals for the District of Columbia Circuit recently confronted a case in which it had to determine how a court should measure illegal profits for disgorgement purposes. *See S.E.C. v. First City Financial Corp., Ltd.,* 890 F.2d 1215 (D.C.Cir.1989). In that case, a corporate raider accumulated over five percent of a target company's shares on the open market without complying with the Williams Act requirement that it report to the Securities and Exchange Commission within ten days of exceeding the five percent threshold. As a result, when the market finally discovered the takeover bid, the share prices rose sharply and the raider was able to sell the shares back to the target company for a profit measured by the district court at $2.7 million. The district court ordered disgorgement of the profit. The raider appealed the district court's measurement of the profit, arguing that its experts estimated the profits to be less than $1,000,000.

Discussing the burdens of proof in establishing profits to be disgorged from violators of the securities laws, the court explained:

> Although the SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment, we believe the government's showing of appellants' actual profits on the tainted transaction at least presumptively satisfied the burden. Appellants, to whom the burden of going forward shifted, were then obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation....
>
> ....
>
> ... Placing the burden on the defendants of rebutting the SEC's showing of actual profits, we recognize, may result,

as it has in the insider trading context, in actual profits becoming the typical disgorgement measure. But the line between restitution and penalty is unfortunately blurred, and the risk of uncertainty should fall on the wrong doer whose illegal conduct created that uncertainty.

*Id.* at 1232. In future proceedings to determine the final amount to be disgorged, the court will be guided by these principles.

It may well be argued that *First City* is distinguishable from this case on the basis that the complicating factor in the profit determination there was quite different from the pass-through problem here. In *First City* the district court had calculated the profits that resulted from the Williams Act violation by simply calculating all of the profits the raider realized (in its eventual sale back to the target company) on the stocks it purchased after the date it should have provided statutory notice to the SEC. The appellant raider objected to this calculation because it omitted consideration of four factors that drove the share prices up but which did not result directly from the failure to notify the SEC of the takeover bid. If these factors had been considered by the court, its determination of the profit that resulted from the violation would have been considerably less.

In the case at bar, the complicating factor is not a volatile market influenced by innumerable variables, but the ability of a corporate defendant to disperse its profits by compensating its officers and employees. In spite of this factual distinction, *First City* remains very persuasive authority. The D.C.Circuit resolved the *First City* case using generalized reasoning applicable in this case. It upheld the district court, explaining that "[r]ules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task. Accordingly, disgorgement need only be a reasonable approximation of profits causally connected to the violation." *Id.* at 1231 (citation omitted). *First City* thus provides this court with a standard governing the degree of precision (or lack thereof) with which this court must proceed in determin-

ing the preliminary and final dollar amounts to be disgorged.

Aside from suggesting that the permissible margin of error is substantial, *First City* also presents a solution to the dilemma of determining how much "profit" ultimately passed to the individual defendants. At the appropriate time, the court will calculate the gross compensation each individual defendant received from CCMV over a period yet to be determined, including but not limited to salary, commissions, bonuses, loans and stock dividends. The result will be a reasonable approximation of the profits causally connected to the violations[7] and received by each individual defendant. The court rejects on these grounds HUD's proposal that the individual defendants incur continuing, joint and several liability for providing restitution of the entire profits of CCMV arising from the violations.

This court concludes that $100,000 is a reasonable preliminary approximation of the amount ultimately to be disgorged. It is reasonable from the perspective of the individual defendants because of the overwhelming likelihood that it understates their ultimate liability. It is also reasonable to them because they can recover restitution paid into the fund upon an adequate evidentiary showing. The $100,000 initial restitution payment is not a final judgment. The Fourth Circuit held in an interim appeal in this case that the asset freeze this court imposed was proper regardless of traceability of profits because it was a preliminary remedy. *See Peterson,* 940 F.2d at 113–14. If the court finds that any individual defendant contributed more to the trust fund than the amount by which he was unjustly enriched, the fund will restore the excess to him. Finally, the order of initial restitution is reasonable in light of the strong evidence presented by

the magistrate judge who administered the asset freeze that the individual defendants cannot be trusted to conserve their assets.

An appropriate Order shall this day issue.

## INTERIM JUDGMENT ORDER

Upon consideration of the parties' arguments relating to the nature of an appropriate equitable remedy against the individual defendants, William Peterson, Arthur Kujawski, James Marley, Richard Costenbader, and Thornton Byram, it is this day

## ADJUDGED AND ORDERED

that:

1) The individual defendants shall be, and they hereby are, permanently enjoined from enforcing any obligation to pay in any contract, deed of trust, or note held by these defendants and entered into between any purchaser and any defendant in connection with purchases of lots at Lake Monticello.

2) The individual defendants shall be, and they hereby are, ordered to make restitution of profits received by each of them individually in connection with sales of lots at the Lake Monticello subdivision in violation of the Interstate Land Sales Full Disclosure Act.

3) The amount of said profits received by the defendants individually shall be initially determined by United States Magistrate Judge B. Waugh Crigler pursuant to 28 U.S.C. § 636(b)(1)(B) in accordance with the accompanying Memorandum Opinion, and may be established by the Secretary using evidence of compensation of the individual defendants by CCMV or other transfers of money or property to the individual defendants from CCMV or other parties or nonparties in connection with the defendants'

---

**7.** The facts before the Court create a strong presumption that a substantial portion of CCMV's net earnings accrued as a result of its failure to comply with the Act's requirements. A conservative estimate of profits causally related to the statutory violations committed at Lake Monticello suggests that they may amount to 4.7 million dollars. *See supra* discussion at 1279. The point to be made here, however, is that

unless CCMV establishes that it received revenues not causally connected to the violations (for example by showing that only half of CCMV's gross revenues were related to its operations at Lake Monticello), all of its profits will be considered connected to the violations. Therefore all compensation paid to officers and employees will also be considered causally related to the violations.

actions as agents of CCMV. The Secretary may present evidence of, but not limited to, compensation paid by CCMV to the individual defendants including salaries, commissions, bonuses, dividends, loans, or any other incentive or reward received by them in any form from CCMV or any other entity in relation to CCMV's lot sales at Lake Monticello. Such compensation or transfers as may be considered shall be limited, except for good cause shown, to those made subsequent to the sale by CCMV of its first lot at Lake Monticello in violation of the Act.

4) Each purchaser of a lot at Lake Monticello will be paid a portion of the total amount in the trust fund described below, based on the price of the purchaser's lot relative to the total price of the lots of all purchasers.

5) A Trustee shall be appointed by the Court to oversee the restitution process; the individual defendants shall be jointly and severally liable to pay all costs associated with administering the trust, and must pay such costs within thirty days of receipt of any bill from the Trustee for such costs. To the extent that any other co-defendant becomes liable for restitution in the future, such defendant shall be liable to the individual defendants for a reasonable contribution towards the initial costs of establishing the trust.

6) The Trustee may, within his or her discretion, make annual disbursements from monies received from any defendants ordered to make restitution to purchasers of lots from CCMV at Lake Monticello.

7) No later than thirty days following the entry of this Order, the individual defendants shall be jointly and severally liable for a deposit of $100,000 with the Trustee as an initial payment on the full amount due.

8) Upon approval by this Court of a final amount of restitution to be made by each individual defendant, those defendants shall thereafter be individually liable to pay such amount to the Trustee within 90 days of the entry of the order, with a continuing obligation to pay thereafter, and interest shall accrue on any unpaid amount at the treasury rate until the judgment is paid in full.

9) If full payment is not submitted to the Trustee within 90 days as required, defendants Peterson, Marley, Kujawski, Costenbader, and Byram, are hereby ordered to make restitution of the monies found by the Court to be owing by them individually, according to the following formula: each year for the seven years from calendar year 1992 through 1998, each defendant shall remit by April 30 of the following year 30% of that defendant's adjusted gross income as reported on that defendant's federal income tax return. If, at the end of seven years, the defendants have still not made full payment of their individual restitution judgments, the defendants shall remain jointly and severally liable for the remainder, and interest shall continue to accrue on the unpaid amount at the annual treasury rate until paid.

10) Each of the defendants shall file an affidavit with the Secretary and with the Trustee, beginning 30 days after the entry of this Order, and continuing annually until full restitution has been made as described above, containing the following information: a listing of all assets and liabilities as of the date the affidavit is filed; current business and home addresses and telephone numbers; monthly and/or annual salary; a list of all income other than salary; and a listing of all bank accounts, including the name of the bank, branch, the account number, and current balance.

11) Paragraph (4) of this Court's Order entered on October 19, 1992 shall be, and it hereby is, vacated, and the asset freeze and sequestration imposed by Order entered February 14, 1991 is hereby reinstated under the same terms.