64 F.3d 920
 U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT, Plaintiff-Appellee,
v.
COST CONTROL MARKETING & SALES MANAGEMENT OF VIRGINIA,
INCORPORATED; William P. Peterson; Arthur
Kujawski; Richard R. Costenbader;
James M. Marley, Defendants-Appellants,
and
Thornton Byron; Stuart Guskind; Earl Hissom; Monticello
Development, Defendants.
 No. 94-2357.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 3, 1995.
Decided Sept. 8, 1995.
 
 ARGUED: Francis Townley Eck, Brian Jay Grossman, Eck & Collins, Richmond, VA, for appellants. Eric Johnson Mahr, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellee. ON BRIEF: Marshall E. Anders, Rosenblum & Anders, Stroudsburg, PA, for appellants. Frank W. Hunger, Assistant Attorney General, Robert P. Crouch, Jr., United States Attorney, William Kanter, Civ. Div., U.S. Dept. of Justice, Washington, DC; Peter S. Race, Audrey B. Kessner, U.S. Dept. of Housing & Urban Development, Washington, DC, for appellee.
 Before HALL and WILKINS, Circuit Judges, and SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.
 Affirmed by published opinion. Judge HALL wrote the opinion, in which Judge WILKINS and Judge SPENCER joined.
 OPINION
 K.K. HALL, Circuit Judge:
 
 
 1
 Cost Control Marketing and Sales Management of Virginia, Inc., and four of its officers appeal orders of the district court enjoining them from violating the Interstate Land Sales Full Disclosure Act and ordering the officers to disgorge $8.65 million in profits to the Secretary of Housing and Urban Development. We affirm.
 
 I.
 
 2
 "Lake Monticello" is a large subdivision located in Fluvanna County, Virginia. It contains 4,592 lots, and was developed between 1968 and 1978 by Monticello Development Company. By 1978, all but 52 of the lots had been sold. Many of the sold lots remained unimproved, however.
 
 
 3
 In 1986, Cost Control Marketing & Sales Management of Virginia, Inc., (CCMV) began purchasing unimproved lots at Lake Monticello. CCMV was formed for the sole purpose of buying and selling lots there. It is wholly owned by three of its officers--defendants William Peterson, Arthur Kujawski, and James Marley. Defendant Richard Costenbader is CCMV's chief executive officer.
 
 
 4
 By July, 1989, CCMV had purchased 919 vacant lots at the subdivision and had undertaken to aggressively advertise them in Washington, New York, and other northeastern markets. By December, 1989, CCMV had sold 585 of its lots. CCMV never took any steps to comply with the Interstate Land Sales Full Disclosure Act, 15 U.S.C. Sec. 1701-1720 (the Act). The Act requires "developers" and their agents to register with the Secretary of Housing and Urban Development (HUD), to provide specified disclosures to prospective purchasers, and to refrain from using certain sales practices. It is patterned, in purpose and in remedies, after the securities laws. Accordingly, in interpreting the Act, courts have applied the more comprehensively developed jurisprudence of securities cases. Flint Ridge Development Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 777-778, 96 S.Ct. 2430, 2433-2434, 49 L.Ed.2d 205 (1976).
 
 
 5
 CCMV failed to register, failed to provide required property reports to purchasers, failed to inform purchasers of a two-year right to rescind afforded purchasers who had not been given the required reports, and flatly refused to rescind upon request. CCMV also used high-pressure, misleading marketing techniques. CCMV was able to sell lots at over three times their assessed value.
 
 
 6
 On November 15, 1989, HUD filed this suit in district court against CCMV, Costenbader, Peterson, Kujawski, and Marley.[1] HUD sought an injunction prohibiting further violations of the Act and disgorgement of all profits realized from CCMV's transactions at Lake Monticello. On February 14, 1990, the district court entered a preliminary injunction and froze the individual defendants' assets (except for reasonable living expenses) to assure that they would not be dissipated. The individual defendants appealed.
 
 
 7
 This court affirmed the preliminary injunction but remanded for the district court to specifically state reasons why the asset freeze was necessary. Kemp v. Peterson, 940 F.2d 110 (4th Cir.1991). In upholding the injunction, we rejected the defendants' only argument against liability--that CCMV is not a "developer" and the individual defendants are neither "developers" nor CCMV's "agents." Id. at 113.
 
 
 8
 On remand, HUD dropped its request for an asset freeze in connection with the preliminary injunction, though it still sought such relief as part of the final judgment. The district court granted summary judgment for HUD and entered an "interim" judgment order and memorandum opinion on April 22, 1992. Kemp v. Cost Control Marketing and Sales Management of Virginia, 790 F.Supp. 1275 (W.D.Va.1992).
 
 
 9
 In holding that a permanent injunction was necessary, the district court noted the "strong propensity" of the defendants to continue to engage in their violations unless enjoined. The court characterized the individual defendants as "absolutely unrepentant," noted that they had twice been certified in contempt by the magistrate, and concluded that "the individual defendants do not feel bound by the orders of this court (or by the law)." Id. at 1277.[2]
 
 
 10
 The court further held that disgorgement of the ill-gotten profits was an appropriate part of the equitable relief available to HUD. Id. at 1278. HUD requested that the individual defendants be ordered to make an initial payment of $100,000, and that they be made jointly and severally liable for whatever final figure the court determined after further proceedings.
 
 
 11
 In support of its request for the interim payment, HUD presented the declaration of the director of its Interstate Land Sales Registration Division, Roger Henderson. Henderson stated that a sample of 258 lots[3] sold by CCMV at Lake Monticello revealed an average disparity of $18,558 between the sale price and assessed value.[4] Henderson then multiplied this disparity times the 466 lots HUD could then show CCMV had sold, and arrived at an approximate profit of about $8.65 million. In light of this substantial figure, which, inasmuch as CCMV admits selling 585 lots, may have been lower than the true amount, the district court had no problem ordering $100,000 as an interim judgment. Finally, in light of the defendants' recalcitrance and unrepentance, "and the strong evidence ... that the individual defendants cannot be trusted to conserve their assets[,]"[5] the court reinstated the asset freeze. Id. at 1281-1282.
 
 
 12
 The defendants noted an interlocutory appeal, which this court dismissed. HUD v. Peterson, No. 92-1570 (4th Cir. June 19, 1992). Marley, Peterson, and Costenbader (but not Kujawski) then filed voluntary Chapter 7 bankruptcy petitions in the bankruptcy court for the Middle District of Pennsylvania. They received discharges in January, 1993.
 
 
 13
 Because HUD believed that neither the automatic stay nor the bankruptcy discharge applied to this case, it proceeded with attempts at discovery aimed at assisting in a final calculation of disgorgement of profits. The defendants refused to answer interrogatories and failed to make the initial $100,000 payment required by the interim judgment order. The district court issued a rule to show cause, and only one (Kujawski) of the defendants even bothered to respond to it.
 
 
 14
 On January 7, 1994, HUD filed a motion for entry of final judgment based on the individual defendants' failure to produce evidence to rebut the reasonable approximation of profits contained in the Henderson declaration. The magistrate recommended granting final judgment. The defendants objected to the report, but the district court adopted the recommended disposition in a memorandum opinion. Cisneros v. Cost Control Marketing and Sales Management of Virginia, 862 F.Supp. 1531 (W.D.Va.1994). The final judgment makes the individual defendants jointly and severally liable for $8.65 million, payable to HUD.
 
 CCMV and the individual defendants appeal.[6]
 II.
 
 15
 The defendants persist in arguing that CCMV is not a "developer" because it simply bought lots that had been developed by someone else. If the dictionary definition of "developer" controlled, they might have a fair case. But the Act defines "developer" in a manner that clearly includes CCMV:
 
 
 16
 any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision.
 
 
 17
 15 U.S.C. Sec. 1701(5). This court rejected CCMV's argument in upholding the temporary injunction, and in a subsequent case, we flatly held that "developer" is not limited, as the defendants continue to argue, to just the initial entity that subdivided and platted the land. Olsen v. Lake Country, Inc., 955 F.2d 203, 205-206 (4th Cir.1991), cert. denied, 503 U.S. 972, 112 S.Ct. 1587, 118 L.Ed.2d 306 (1992). CCMV was a defendant in Olsen --though not the primary defendant--and the same Richmond law firm represented the "developer" there. 955 F.2d at 204 and id. n. 1. Consequently, the defendants' failure to cite Olsen in its brief or to respond to HUD's citation in its reply are troubling to the court, to say the least. We remind counsel that a lawyer's duty of candor to the court must always prevail in any conflict with the duty of zealous advocacy.
 
 
 18
 In any event, CCMV is a developer under circuit precedent, the law of the case, and the plain language of the statute.
 
 III.
 
 19
 The individual defendants' assertion that they are not "developers" or "agents" of CCMV is also foreclosed by the law of the case. See Kemp, 940 F.2d at 113.IV.
 
 
 20
 When the interim judgment order was entered, HUD and the district court doubtless envisioned that a searching inquiry into the individual defendants' finances would follow to see how much of the ill-gotten gains had flowed through CCMV and into their pockets. The district court's order clearly contemplated the submission of much more evidence.
 
 
 21
 It never happened. The defendants refused to answer interrogatories or produce documents that might have led to a more exact figure than the $8.65 million estimated in the Henderson declaration, notwithstanding certifications of contempt. Only one of the four bothered to respond to an order to show cause. Likewise, during the 27 months between the entry of the interim judgment and the final judgment, the defendants produced no evidence of their own to contradict the Henderson declaration, though, if its calculation were inflated, they had every incentive to do so.[7]
 
 
 22
 The defendants nonetheless have the chutzpah to attack the sufficiency of HUD's proof to support the $8.65 million award. Though the district court considered but chose not to enter judgment as a sanction, we think that the defendants' discovery misconduct alone might be sufficient to uphold the award.
 
 
 23
 In any event, HUD's evidence is absolutely uncontradicted. The defendants argue simply that the Henderson declaration is hearsay and therefore of no value whatever on summary judgment. This argument is their best; hearsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment. Maryland Highways Contractors Ass'n v. State of Maryland, 933 F.2d 1246, 1251-1252 (4th Cir.), cert. denied, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991).[8]
 
 
 24
 Here, the Henderson declaration serves as a summary of voluminous evidence. Something like it would doubtless have been permitted at a trial of this case. See Fed.R.Evid. 1006. Moreover, though the parties do not emphasize the point in the briefs, there are sworn declarations from eleven of the lot purchasers in the record. The sales figures and assessed values sworn to by these declarations[9] corroborate the Henderson declaration's calculation. In addition, Bobby C. Durham, a real estate agent in Charlottesville, Virginia, sponsored a copy of the local Multiple-Listing Service (MLS) printout for mid-November, 1989. The MLS information showed that dozens of unimproved lots at Lake Monticello had sold for less than $10,000 during early and mid-1989, and dozens more were listed for sale at similar prices as of November 14, 1989.[10] We believe that this admissible evidence serves as a sufficient foundation for the Henderson declaration, especially under the peculiar facts of this case, in which the defendants have contumaciously refused to disclose evidence that would have provided a better foundation.
 
 
 25
 Finally, the district court noted that estimating ill-gotten profits to fashion a disgorgement remedy is an imprecise science, and it adopted the analysis of the D.C. Circuit in SEC v. First City Financial Corp., 890 F.2d 1215 (D.C.Cir.1989). Though the government always retains the burden of persuasion, First City and the district court set a practical standard for the government's initial burden of coming forward. Once the government establishes the defendants' liability and produces a reasonable approximation of the illegal profits, it is up to the wrongdoers to come forward with evidence to rebut the approximation. Requiring too detailed an initial showing by the government could provide a sanctuary for defendants, like these, who are wily or obstinate enough to hide the truth.
 
 
 26
 HUD's disgorgement calculation may be based on thin evidence, but it prevails over the defendants' evidence, which is nil.
 
 V.
 
 27
 In the first appeal in this case, this court held that an asset freeze, though extraordinary, is within the district court's power in fashioning an equitable remedy. "Such a remedy ... must be supported by a showing of fraud, mismanagement, or other reason to believe that, absent the freeze order, the assets would be depleted or otherwise become unavailable." Kemp, 940 F.2d at 114. The court remanded only because it was unable to discern the district court's specific reasons for entering the freeze. Fed.R.Civ.P. 65(d).
 
 
 28
 The district court made no such error of omission here. It stated flatly, after an opinion teeming with references to the defendants' recalcitrance, that "the individual defendants cannot be trusted to conserve their assets."
 
 VI.
 
 29
 The three individual defendants who filed bankruptcy petitions argue that they should not be faulted for failing to defend this action during the bankruptcy proceeding and that their discharge should bar entry of the disgorgement order.
 
 
 30
 Though the discharge issue is reasonably close, we affirm for the reasons given by the district court. 862 F.Supp. at 1533-1534.[11] In short, though the filing of a bankruptcy petition ordinarily acts as a stay of pending judicial proceedings, 11 U.S.C. Sec. 362(a)(1), the stay does not apply to "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power[.]" Sec. 362(b)(4). This exception to the stay precisely fits this case.[12] See Board of Governors of Federal Reserve System v. MCorp Financial, 502 U.S. 32, 39-40, 112 S.Ct. 459, 463-464, 116 L.Ed.2d 358 (1991).
 
 
 31
 Moreover, because discharge in bankruptcy is not intended to be a haven for wrongdoers, a Chapter 7 debtor may not discharge "a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and [that] is not compensation for actual pecuniary loss[.]" 11 U.S.C. Sec. 523(a)(7). The defendants have a fair argument here, because HUD has measured its disgorgement remedy by the amount lot purchasers lost, and it has often stated in this record that it intends to use some or all of its recovery to reimburse those purchasers. On the other hand, the final judgment orders payment to HUD and imposes no obligation on HUD to disburse the money to anyone.
 
 
 32
 The Supreme Court has given Sec. 523(a)(7) a broad reading, and has held that it applies to all criminal and civil penalties, even those designed to provide restitution to injured private citizens. Kelly v. Robinson, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (criminal restitution obligation was not dischargeable); Pennsylvania Dep't of Public Welfare v. Davenport, 495 U.S. 552, 562, 110 S.Ct. 2126, 2132-2133, 109 L.Ed.2d 588 (1990) (stating that Sec. 523(a)(7) applies to both criminal and civil fines).
 
 
 33
 We interpret these cases to say that so long as the government's interest in enforcing a debt is penal, it makes no difference that injured persons may thereby receive compensation for pecuniary loss. In other words, the "not compensation for actual pecuniary loss" phrase in Sec. 523(a)(7) refers to the government's pecuniary loss.[13] For example, a person drives recklessly and collides with a city garbage truck. A city policeman issues him a traffic ticket, and the city attorney files a negligence suit and obtains a judgment for the amount of damage to the garbage truck. The person can discharge the judgment for damaging the truck, but he cannot discharge his reckless driving fine. We therefore agree with the district court that the judgment in this case is not dischargeable in a Chapter 7 bankruptcy proceeding.
 
 
 34
 The judgment is affirmed.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 Monticello Development Corp. and three of CCMV's salespersons were also sued, but the claims against them have been dismissed
 
 
 [2]
 Because it believed that an additional sanction would serve no purpose, HUD dropped its request that the district court act on the magistrate's two certifications of contempt. The district court acceded, but stated on the record, "I want no doubt in anyone's mind that on that record made before the magistrate judge, these individual defendants are flatly guilty of contempt of court."
 
 
 [3]
 HUD mailed questionnaires to 466 lot purchasers it had identified. The 258 questionnaires returned formed its sample
 
 
 [4]
 By law, Virginia assesses at 100% of market value. Though the defendants suggest that assessments are de facto below market value, they presented no evidence of it
 
 
 [5]
 As "but one egregious example" of the defendants' profligate dissipation of assets, the court cited a "purported gift" of $300,000 from defendant Marley to his son. 790 F.Supp. at 1279-1280
 
 
 [6]
 Though it was clearly intended to resolve all claims against all parties, the final disgorgement order does not mention CCMV by name. HUD has not sought correction of this inadvertent error, and it states in its brief that it is content to seek satisfaction of its judgment from the four individual defendants
 
 
 [7]
 No skeptic can ignore the corollary inference--production of evidence may well have shown that Henderson underestimated the defendants' ill-gotten gains. As we noted above, CCMV sold over 25% more lots than Henderson supposed. Moreover, a Lake Monticello homeowners' association newsletter suggests that CCMV may have purchased lots at well below their assessed value
 
 
 [8]
 This rule is not unfailingly rigid, though. In Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554-2555, 91 L.Ed.2d 265 (1986), the Supreme Court held that the nonmoving party could defeat summary judgment with materials capable of being reduced to admissible evidence at trial. HUD, of course, was the moving party; nonetheless, the practical question presented by a motion for summary judgment is whether the case presents a genuine issue of fact for trial rather than whether the parties have put their evidence in final form
 
 
 [9]
 The eleven owners purchased a total of twelve unimproved lots at prices ranging from $20,900 to $33,200. Three of the eleven provided copies of their latest tax assessments; two of these lots were assessed at $7,000 and the other at $7,500. The purchase prices are of course based on the purchasers' personal knowledge, and the tax assessments are admissible under Fed.R.Evid. 803(8)
 
 
 [10]
 The MLS printout qualifies as a "record[ ] of regularly conducted activity" under Fed.R.Evid. 803(6). Though Durham was not the custodian of the MLS records, Rule 803(6) permits such records to be sponsored by any "qualified witness, unless the source of the information or circumstances of preparation indicate lack of trustworthiness."
 
 
 [11]
 The district court had concurrent jurisdiction with the bankruptcy court to determine the effect of the bankruptcy proceeding on this case, Brock v. Morysville Body Works, Inc., 829 F.2d 383 (3rd Cir.1987), and, because the district court's jurisdiction attached first in time, it was superior. Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922)
 
 
 [12]
 The stay, moreover, terminates by operation of law upon entry of the discharge. 11 U.S.C. Sec. 362(c)(2)(C)
 
 
 [13]
 Even where a debt is intended to help defray the expense of government, it may not be dischargeable if its primary purpose is penal. E.g., In re Thompson, 16 F.3d 576 (4th Cir.1994) (court costs assessed against convicted criminal defendant were not dischargeable)