**In re John L. BOZZELLI and Sarah C. Bozzelli, Debtors.**

**Bankruptcy No. 98–15214DWS.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Dec. 14, 1998.

Mark Blank, Jr., Paoli, PA, for debtor.

Daniel Sager, Pottstown, PA, for the Valenteens.

Gloria Satriale, Chester Springs, PA, Chapter 7 Trustee.

Dave P. Adams, Office of U.S. Trustee, Philadelphia, PA, for United States Trustee.

### *OPINION*

DIANNE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Debtors' Motion to Avoid a Judicial Lien (the "Motion") held by Ralph and Tina Valenteen that allegedly impairs the exemption on the Debtors' residential real estate. Not unexpectedly the focus

of this contested matter is the value of the Debtors' residence. As explained more fully below, I conclude that there is no equity in the residence and grant the Motion.

## BACKGROUND

On March 4, 1998, Ralph and Tina Valenteen (the "Valenteens") obtained a judgment against the Debtors, John and Sarah Bozzelli in the amount of $4,597.57. Contending that the value of their house is $92,500, the Debtors argue that the lien created by the Valenteens' judgment impairs the exemption in their real estate. The Valenteens, on the other hand, allege that the Debtors' house is worth up to $169,070 and that sufficient value exists in the property to pay all other liens, allow the Debtors the maximum potential exemption, and satisfy the judgment.

At the hearing held on November 3, 1998, the Debtors explained that they built the house on land in the borough of Phoenixville purchased for $24,000 on June 10, 1996. Thereafter, John Bozzelli, who was a contractor, built the house to a state of substantial completion using his own labor, estimated to have been worth about $25,000. The Debtors also invested an additional $10,000 of their own funds in the construction and took out a construction loan in the amount of $72,000. Notwithstanding these expenditures, the house was not built to completion because the Debtors ran out of money. The list of unfinished work in the house is too long to recite in full but includes stuccoing the exterior walls, completing the installation of flooring and molding throughout, finishing the bathrooms and installing kitchen cabinetry. Based on estimates received from other contractors, an expenditure of $35,000 to $40,000 would be necessary to finish construction. Despite the fact that the house is incomplete, it has nevertheless reached the point of habitability, and the Debtors' family has taken up residence therein.

■ The Debtors stipulated that their property is encumbered by three liens in addition to the Valenteens' judgment: a tax lien in the amount of $213.07, a mechanics lien for $16,031.68 and the construction mortgage for $72,304.99. The liens total $88,-549.74. The Debtors' schedules reveal they claimed an exemption in their real estate in the amount of $18,000.[1]

Glenn W. Perry ("Perry"), a realtor and professional appraiser, offered expert valuation testimony for the Debtors based on a written appraisal report he prepared on September 1, 1998. Exhibit DM–2. Using primarily a comparable sales analysis, Perry concluded that the Debtors' property has a fair market value of $92,500. Perry explained that he used five comparable properties in his analysis. The first three properties are in the Debtors' neighborhood, but are smaller and older than the Debtors' house. Perry stated that the Debtors' property is an "over improvement" for the neighborhood, meaning that it is larger and newer than other houses in the immediate vicinity. To compare these properties to that of the Debtors, Perry was required to make significant upward adjustments to their sale prices to account for the differences in size and age. He was also required to make a downward adjustment in the amount of $35,000 to each property to compensate for the Debtors' house being unfinished. The adjusted sales prices for the comparables were $87,500, $95,830 and $86,800 respectively.

Comparables four and five were selected from a different area of Phoenixville where the houses are newer and larger. These properties, which sold for $155,000 and $151,-000, were selected because of their similarity to the Debtors' house in size and age. Comparison to the Debtors' house, however, required their sales prices to be adjusted downward not only because the Debtors' house needs additional work ($35,000) but also to account for the better neighborhood

---

1. I take judicial notice of the Debtors' scheduled exemptions. While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, *In re Aughenbaugh*, 125 F.2d 887 (3d Cir.1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not under-

mine the trial court's fact finding authority." *In re Indian Palms Assoc.*, 61 F.3d 197, 205 (3d Cir.1995) *citing* Fed.R.Evid. 201(f) advisory committee note (1972 proposed rules). The amount of the exemption is not disputed. Indeed it appears that the Debtors are entitled to claim an exemption of up to $32,300. 11 U.S.C. § 522(d)(1).

in which the newer houses are located. The change in neighborhoods resulted in two downward adjustments, a $20,000 adjustment on account of the better surroundings and a $5,000 adjustment for an improved "view." The adjusted sales prices of these houses were $102,000 and $95,000 respectively. The average adjusted sale price for all five properties was $93,426.

Perry also calculated the value of the Debtors' property on a cost basis. He estimated the reproduction expense of the Debtors' house at $119,096, but discounted this figure by $35,000 for completion costs and $20,000 for being an "over improvement" in the Debtors' neighborhood. Adjusted in this manner, Perry valued the house itself at $64,096 ($119,096 − $55,000 = $64,096). Adding in the value of the land (at the purchase price of $24,000) plus $2,500 for the "as is value of site improvements," Perry arrived at a value for the property of $90,596. Because this figure is lower than the average adjusted price of the comparable sales ($93,-426), he reconciled the two by choosing a figure between them, arriving at a final value of $92,500.

The Valenteens did not present appraisal evidence of their own but instead submitted a tax lien certificate from Chester County indicating that the property was assessed at $169,070. Exhibit R–1. With respect to the Chester County assessment, the Debtors testified that they had no recollection of ever being visited by a County appraiser. Moreover, Perry testified that it is not the practice

of the County to enter into and inspect homes. The Debtors did not appeal that assessment.

At the hearing, the Valenteens' counsel argued that the County tax assessment constitutes a determination of the property's fair market value to which this Court is required to adhere as a matter of law.[2] In their legal memorandum, the Valenteens now claim that it is the doctrine of collateral estoppel which renders the assessment binding in this proceeding. The Valenteens thus hold firm to the position that the assessor's value of $169,070 controls without regard to the property's interior condition.[3] Additionally, the Valenteens argued that Perry should not have adjusted the property value because of the surrounding neighborhood and that he failed to use similar properties in the sales comparison analysis.

## DISCUSSION

■ The Motion is filed under § 522(f) which permits debtors to avoid judicial liens impairing exemptions.[4] Application of § 522(f) here mandates that the Valenteens' judicial lien be avoided to the extent all of the liens on the Debtors' property, plus the Debtors' exemption, exceed the property's value. The Debtors bear the burden of proof. *In re Kerbs*, 207 B.R. 211, 214 (Bankr.Mont.1997); *Carter v. W.S. Badcock Corp. (In re Carter)*, 180 B.R. 321, 323 (Bankr.M.D.Ga.1995).

> (f)(1) Notwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—
> (A) a judicial lien . . .
> . . .
> (2)(A) For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of—
> (i) the lien;
> (ii) all other liens on the property; and
> (iii) the amount of the exemption that the debtor could claim if there were no liens on the property; exceeds the value that the debtor's interest in the property would have in the absence of any liens.
> 11 U.S.C. § 522(f).

**2.** Counsel stated that since Pennsylvania statute defines assessment value as fair market value, I have no discretion but to accept the assessor's $169,070 in this contested matter. I requested briefing so that I might have the benefit of his authority on this point. None was provided. However, as the question of the weight to be accorded a tax assessment of real property in a bankruptcy proceeding arises with some frequency, I have reviewed the cases and set forth my views on this issue herein.

**3.** At the hearing, Debtor's counsel appeared to concede that the County's valuation may need to be discounted $35,000 by reason of the property's condition but later backed away from that position in his post-trial memorandum of law.

**4.** In pertinent part, section 522(f) reads as follows:

In this case, the total value of the liens on the property plus the Debtors' exemption equals $106,549.74 ($88,549.74 + $18,000). If I value the residence at $92,500, as claimed by the Debtors (or any greater amount up to $106,549), the amount of the liens plus the exemption exceed the property's value and the Valenteens' lien is avoidable. If, however, the property is valued at $169,070, as urged by the Valenteens, the opposite result obtains. Thus, the Debtors' ability to avoid the lien turns exclusively on the value of the property.

■ I find that the Debtors' evidence establishes the value of the property at $92,500. None of the Valenteens' arguments to the contrary is persuasive. The Valenteens first argue that the Court is bound by the County's tax assessment under the doctrine of collateral estoppel. Under Pennsylvania law, for collateral estoppel to apply, it must be shown that (1) the issue decided in prior adjudication was identical to that presented in the later action; (2) there was final judgment on merits; (3) the party against whom the doctrine is asserted was party or in privity with the party to the prior adjudication; and (4) the party against whom the doctrine is asserted has had full and fair opportunity to litigate the issue in question in the prior action. *Schulman v. J.P. Morgan Investment Management, Inc.*, 35 F.3d 799, 805 (3d Cir.1994) (*quoting Sanders v. Sanders*, 384 Pa.Super. 311, 558 A.2d 556, 560 (1989), *allocator denied*, 525 Pa. 635, 578 A.2d 930 (1990)). Thus, collateral estoppel is a doctrine that only obligates a court to honor decisions on issues that have previously been litigated and decided. *See also C.D.G. Inc. v. Workers' Compensation Appeal Board*, 702 A.2d 873, 875 (Pa.Cmwlth. 1997).

■ In this case, it is undisputed that the value of the Debtors' property has never been litigated. The County assessed the property and fixed a value for the purpose of calculating the Debtors' taxes. Had the Debtors have appealed that determination, a hearing would have been held at which the value of their property would have been decided in a contested, adjudicatory setting. 72 Pa.S. §§ 5020–511, 5020–518.1 & 5020–518.2. However, the Debtors did not appeal. As the value of the property was never litigated, there is no adjudicatory determination of the property's value to which I am bound. The Debtors' failure to challenge the assessment, while binding them to that value for purposes of taxation, does not establish the property's value for other purposes.

■ Moreover, I find no support for the proposition that a tax collector's assessment alone is dispositive of value in a bankruptcy proceeding. Rather a review of the cases indicates that it is but one factor to be weighed by the court. This principle obtains even where there is a state statute requiring tax assessments of real property to be made at 100% of fair market value as is the case in Pennsylvania. 72 P.S. § 5020–402.[5] If that were not the case, the Third Circuit Court of Appeals in *In re Ward*, 837 F.2d 124, 128 (3d Cir.1988), would not have agreed with the bankruptcy court which found a tax collector's assessment and appraisal report to be insufficient to prove lack of equity where the New Jersey statute, similar to the one in Pennsylvania, sets the measure of value in tax assessments at fair market value. N.J.S.A. 54:4–2–25.[6] *See also Kemp v. Cost Control Marketing and Sales Management*, 790 F.Supp. 1275, 1278 (W.D.Va.1992) (where state statute requires tax assessments be made at 100% of fair market value, they carry a high degree of certainty of the fair

---

5. Valenteens' counsel refers to this statute when he argues that I am bound to accept the assessment as declarative of fair market value. The Court in *Appeal of/Property of Cynwyd Investments*, 679 A.2d 304, 307 (Pa.Commw.1996), construing 72 P.S. § 5020–402 which provides that for assessment purposes, property is valued at "the actual value thereof, and at such rates and prices for which the same would separately sell," noted that the term actual value means market value.

6. Recognizing that the New Jersey statute has been construed to state that the tax assessment value must be the market value of such property, the New Jersey district court in *A–S Development, Inc. v. W.R. Grace Land Corp.*, 537 F.Supp. 549, 557 (D.N.J.1982), nonetheless, did not find itself bound by a real estate tax assessment in determining value of a property for the purpose of calculating damages.

market value but court will consider evidence that they do not represent the actual market value in arriving at a final judgment amount.).

The overwhelming majority of courts treat the tax assessment as but one appraiser's opinion of fair market value and while probative of value, it is only as persuasive as the underpinnings for its conclusion. In *In re Rehbein*, 49 B.R. 250, 251–53 (Bankr.D.Mass. 1985), the court considered the probative value of a tax assessment in fixing real property value for the purpose of a § 522(f) lien avoidance motion. The court dismissed the affidavit of the Chairman of the Board of Assessors which provided the current value of the property based on the tax assessment after it was elicited in testimony that the assessment was performed three years earlier and property values had increased by 20–25%. In *In re Wermelskirchen*, 170 B.R. 118, 120–21 (Bankr.N.D.Ohio 1994), Debtor's appraiser utilized a comparative market approach supported by the County's tax valuation which purported to represent a 100% tax assessment value on the subject property. However, he was unable to state precisely when the County provided the assessed value and acknowledged that the true fair market value of the property is reduced by 33 1/3% to derive tax assessment value. The Court, in its analysis of value appeared to totally ignore the tax assessment.

Where there is no evidence of value other than that provided by the tax assessment, not surprisingly it has been accepted as the value of property in bankruptcy.[7] *E.g. Gunter v. GMAC Financing Corp. (In re Gunter)*, 100 B.R. 311, 314 (Bankr.E.D.Va.1989) (in determining value for purposes of a § 522(f) motion, tax assessment was the best evidence of the value of the debtor's property); *In re Harris*, 192 B.R. 334, 336 (Bankr. W.D.N.Y.1996) (creditor met burden to prove lack of equity using tax assessment where debtor did not appear). However, since the tax assessment is not usually the sole evidentiary record of value, it is most frequently considered as corroborative of other evidence or useful to define the range of possible

values. *See, e.g. Beard v. DeVito (In re DeVito)*, 111 B.R. 529, 532–33 (Bankr. W.D.Pa.1990) (market value somewhere between the value proposed by the trustee's appraisal which the court found questionable and the value proposed by defendants/owners which relied on tax assessment); *In re Adams*, 86 B.R. 867, 868 & n. 1 (Bankr. E.D.N.C.1988) (value advanced by debtor's appraiser was corroborated by tax assessment which was in the same range); *Cole v. Seruntine (In re Seruntine)*, 46 B.R. 286, 288 (Bankr.D.Cal.1984) (tax assessment is one guide for debtor to utilize in fixing real property value for the purposes of bankruptcy schedules); *In re Hagel Partnership Limited*, 40 B.R. 821, 822 (Bankr.D.C.1984) (accepting tax assessment where the amount fell between the valuation figures advanced by competing appraisers).

As I find no legal imperative to accept the tax assessment as conclusive of fair market value, I must determine what, if any, weight it must be accorded in this contested matter. For the assessment to have persuasive force, the analysis behind it needs to be convincing. In this instance, the analysis is not presented at all. Indeed the assessed value is merely recited in a tax lien certificate. Exhibit R–1. From that document, I discern that the assessed value as of the date of the certificate, September 14, 1998, is $169,070. Significantly, I cannot determine when the assessment was performed. Moreover, I have no indication of the methodology employed, *i.e.*, if comparables were used, what they were, how they were adjusted, or what other factors compel the assessor's conclusion. I do know, however, that the assessor did not inspect the interior of the Debtors' property which fact places the assessment at a significant disadvantage in comparison to the Debtors' appraisal. In these circumstances, I find the assessment value to be of no utility to me in determining value of the residence.

The Valenteens' other arguments against the Debtors' appraisal are likewise unavailing. The Valenteens argue that under the cost approach a property cannot be depreciated on account of external factors such as

---

7. *But see In re Butler*, 51 B.R. 261, 265 (Bankr. D.C.1984) (refusing to accept tax assessment as

evidence of value for property, finding such assessments to be "notoriously inaccurate").

the state of the neighborhood in which it is located.[8] Perry deducted $20,000 in depreciation for this "external obsolescence." In support of this assertion, the Valenteens cite *Cynwyd Investments, supra,* but I find that proposition not to be addressed in the short footnote that describes the methodology of the cost approach. The court in *Cynwyd* merely stated that subtraction of "the facility's depreciation" is one component of the cost approach calculus. How that depreciation is to be determined was never addressed. *Id.* at 308 n. 2. On the other hand, where an expert witness is not contradicted, I have no basis to reject his opinion. Therefore I accept Perry's deduction of external obsolescence as a component of depreciation. In any event, Perry's use of the cost approach merely confirmed the value derived by application of the comparable sales approach and was not the sole determinant of value of the residence.[9]

Finally, the Valenteens assert that the Perry appraisal is flawed because the properties it relies upon as comparables are not similar to the Debtors' property. This argument may have some superficial merit in light of the fact that other properties in the immediate vicinity were described by Perry as being smaller and older. Nevertheless, the argument lacks support in the absence of independent appraisal evidence showing that Perry excluded other more similar properties from his analysis. According to Perry, the properties he used were the most comparable ones available to him. The Valenteens did not demonstrate otherwise. Moreover, Perry compensated for the disparate characteristics of the comparables by appropriate adjustments to the sale prices.

In sum, Perry's appraisal is unrebutted and remains the single most persuasive evidence of record on the value of the Debtors'

property. The tax assessment has little persuasiveness because it is presented as a mere conclusion without explanation. For these reasons, I accept Perry's appraisal as the best evidence of value of the Debtor's residence and find the Debtor's residential real estate to be worth $92,500. Accordingly, the Valenteens' lien impairs the Debtors' exemption and must be avoided.

---

8. The Valenteens acknowledge that there is no testimony as to how the County derived its market value and that the property may be overvalued by the use of only the sales comparable approach. However, they conclude that if the cost approach was utilized, the property would still have a market value of $133,000. Memorandum at 3. They do not explain how they reached the $133,000 valuation number.

9. Ironically, the Valenteens also criticize the Perry appraisal for its use of the cost approach, asserting that the cost approach is not applicable to a property that is incomplete. No authority is advanced in support of this position, and I therefore have no grounds to give it any credence where the only expert witness stated otherwise. However, even if they were correct, the absence of the cost approach analysis does not detract from the evidence of value already provided by the sales comparable approach.