# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**CashCall, Inc., and J. Paul Reddam, in his capacity as President and CEO of CashCall, Inc., Defendants Below, Petitioners**

**vs) No. 12-1274** (Kanawha County 08-C-1964)

**Patrick Morrisey, Attorney General, Plaintiff Below, Respondent**

**FILED**

May 30, 2014

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioners CashCall, Inc. and J. Paul Reddam (collectively referred to as "CashCall"), by counsel Charles L. Woody and Bruce M. Jacobs, appeal three orders entered by the Circuit Court of Kanawha County in favor of Respondent Patrick Morrisey, West Virginia's Attorney General,[1] following a two-phase trial regarding CashCall's violations of the West Virginia Consumer Credit Protection Act ("WVCCPA"), West Virginia Code §§ 46A-1-10l to 46A-8-102. The first order, entered September 10, 2012, addressed the State's abusive debt collection claims against CashCall. The second order, also entered September 10, 2012, addressed the State's usurious lending claims against CashCall. The third order, entered March 18, 2013, addressed the circuit court's award of attorney's fees as costs in favor of the State. In total, the circuit court ordered CashCall to pay more than $13.8 million in penalties and restitution, and $446,180.00 in fees and costs. The Attorney General, by counsel Norman Googel and Douglas L. Davis, filed a response to which CashCall filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the trial court's orders is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner CashCall, Inc. is a California-based consumer finance company. Petitioner J. Paul Reddam is the President and Chief Executive Officer of CashCall, Inc.[2] At issue in this case

---

[1]This case was originally filed by Darrell V. McGraw, Jr., the former Attorney General of West Virginia.

[2]On October 17, 2011, the circuit court entered a pretrial order that granted in part and denied in part Petitioner J. Paul Reddam's motion to dismiss. The court found that there were no allegations in the State's complaint (except paragraph 13) referencing Mr. Reddam, and that the State did not seek any relief against Mr. Reddam. As such, the circuit court determined that it

1

is CashCall's marketing agreements with the First Bank and Trust of Millbank, South Dakota ("FB&T"). FB&T was chartered in South Dakota and is supervised and insured by the Federal Deposit Insurance Corporation ("FDIC"). FB&T makes small unsecured loans at high interest rates to consumers in various states. Under CashCall's marketing agreements with FB&T, CashCall purchased FB&T's loans within three days of each loan's origination date.[3] Between August of 2006 and February of 2007, CashCall purchased loans made by FB&T to 292 West Virginia residents. Of those loans, ten were for $1,075.00 at an eighty-nine percent annual interest rate; 214 were for $2,600.00 at a ninety-six percent annual interest rate; and the remaining sixty-three loans were for $5,000.00 at a fifty-nine percent annual interest rate. Eventually, 212 of CashCall's 292 West Virginia consumers defaulted on these loans.

In 2007, the Attorney General opened a formal investigation into CashCall's business practices in response to consumer complaints of debt collection abuse. On June 7, 2007, the Attorney General sent CashCall's general counsel, Dan Baren, a letter demanding that CashCall permanently cease its lending program in West Virginia and make restitution to the aggrieved consumers. The State based this demand on its findings that CashCall's agreement with FB&T was essentially a sham that claimed federal preemption as a means of evading West Virginia's licensing and usury laws, and that CashCall's debt collection practices violated the WVCCPA.

CashCall responded to the Attorney General's demand by letter dated June 15, 2007. CashCall claimed that the WVCCPA was preempted by federal law because the loans marketed and serviced by CashCall were properly made under a Federal Deposit Insurance Approved ("FDIA") bank installment loan program. Nevertheless, that same year, CashCall ceased purchasing loans made by FB&T to West Virginia residents.

On August 30, 2007, the Attorney General issued an investigative subpoena, pursuant to West Virginia Code § 46A-7-104(1), that directed CashCall to produce records for all of its lending and debt collection activities in West Virginia. CashCall refused to answer the subpoena based, among other things, on its claim of complete federal preemption. Following considerable litigation regarding the subpoena, CashCall provided various business records including the names and contact information for its West Virginia customers. However, CashCall provided those records primarily in paper format, even though the Attorney General asked for the documents in a searchable electronic format, and CashCall routinely maintained the documents in a searchable electronic format.

On October 8, 2008, the State filed a "Complaint for Injunction, Consumer Restitution, Civil Penalties and Other Appropriate Relief" in the circuit court against CashCall alleging usurious lending and abusive debt collection practices. The Attorney General claimed that CashCall participated in what is commonly called a "rent-a-bank" scheme designed to avoid a

---

would not impose any liability against Mr. Reddam, but ordered him to remain a party to the action.

[3]FB&T retained the origination fee and all interest accrued prior to the date of CashCall's purchase of a loan.

2

state's usury and consumer protection laws by claiming federal preemption under Section 27 of the Federal Deposit Insurance Act ("FDIA").[4] In response, CashCall removed the action to the United States District Court for the Southern District of West Virginia on the ground that the State's claims were preempted given that FB&T originated the loans to the 292 West Virginia consumers.

In *West Virginia v. CashCall, Inc.*, 605 F.Supp.2d 781 (S.D.W.Va. 2009), the district court found that the FDIA did not apply to non-bank entities such as CashCall. The district court also ruled that it did not have subject matter jurisdiction over the matter because the Attorney General had raised only state law claims against CashCall that neither invoked, nor were preempted by, the FDIA. The district court noted that "[i]f CashCall is found to be a de facto lender, then CashCall may be liable under West Virginia usury laws." *Id.* at 787. The district court then dismissed CashCall's action and granted the Attorney General's motion to remand the case to the Circuit Court of Kanawha County.

Following the remand, the Attorney General filed an amended petition against CashCall that included fifteen causes of action. The first cause of action concerned CashCall's failure to comply with the Attorney General's subpoena.[5] The State's second through fourth claims alleged unlawful lending and usury. Claims five through fifteen alleged unlawful debt collection practices. Thereafter, the circuit court bifurcated the claims for trial. The "phase one" trial addressed the State's unfair debt collection claims and took place on October 31 and November 1, 2011. The "phase two" trial addressed the State's unlawful lending and usury claims and was held on January 3, 2012. Both trials were bench trials.

### Phase One Trial: Unfair Debt Collection Claims

During the phase one trial regarding CashCall's alleged unfair collection claims, the State called twelve witnesses. The first of these witnesses had not obtained a loan purchased by CashCall, but her son had. Therefore, this first witness testified about abusive calls she received from CashCall regarding her son's loan. The next nine witnesses had obtained and then defaulted on loans originated by FB&T and purchased by CashCall. All nine testified to CashCall's abusive debt collection practices, which included CashCall's repeated threats to do "whatever it takes to get our money" including visiting consumers' homes and places of employment; charging fees for field visits; contacting the consumers' employers; disclosing debts to third parties; and initiating arbitration, legal action, wage garnishment, and/or attachment of personal and real property. The State's last two witnesses, Rachel Gray and Angela White, where both long-time paralegals in the Attorney General's Consumer Protection Division. Both testified about their analysis of the records CashCall had produced during discovery and their preparation of the State's summary trial exhibits.

---

[4]Section 27 of the FDIA, 12 U.S.C. § 183l(d), allows a state-chartered bank to charge whatever interest rates are permitted by its home state and does not require that such a lender obtain a lender license from any state other than its home state.

[5]This first cause of action was dismissed prior to the phase one trial.

3

Paralegal Rachel Gray testified about her preparation of "State Summary Exhibit A" ("Exhibit A") regarding letters CashCall had sent to West Virginia consumers. Ms. Gray testified that she searched CashCall's West Virginia's consumers' files page-by-page to determine which of its form letters CashCall had sent to each consumer. Those form letters included an employment verification letter, a breach letter, a forty-eight-hour notice letter, a broken promise letter, an arbitration letter, a field visit letter, and a final demand letter. Ms. Gray testified that she compiled the total number of each type of letter found in each of the 292 West Virginia consumers' files into Exhibit A.

Paralegal Angela White testified regarding her preparation of "State Summary Exhibit B" ("Exhibit B") that summarized the number of phone calls CashCall made to each West Virginia consumer. Ms. White stated that she did not personally review all of the relevant phone logs, but oversaw the eight to ten people who did. Ms. White also testified that four professional data entry personnel entered the data into a comprehensive chart, and that the data entry staff made a second review before a questionable call was counted. After the data was entered, Ms. White prepared Exhibit B which listed the following: the number of calls made by CashCall to each West Virginia consumer, the number of days each consumer was called, the number of calls made to each consumer per day, and the date of the first and last calls to each consumer. The number of calls was also broken down into the number of days that a consumer received twenty or more calls in a day; the number of days that a consumer received fifteen to nineteen calls in a day; the number of days that a consumer received ten to fourteen calls in a day; the number of days that a consumer received five to nine calls in a day; and finally, the number of days that a consumer received one to four calls in a day.

According to Exhibit B, CashCall made a total of 84,371 calls to its 292 West Virginia consumers. Sixteen of those consumers each received more than 1,000 calls from CashCall; forty received between 500 and 1,000 calls; and eighty-six received between 200 and 500 calls. Exhibit B also lists the number of times CashCall called one of the 292 consumers' references (542 times), the number of times CashCall contacted a consumer at work (172 times); and the number of consumers who unlawfully received a notice of arbitration from CashCall (262).

CashCall called only two witnesses during its case-in-chief. The first was Elissa Chavez, CashCall's Director of Fraud Prevention and Dispute Resolution. Ms. Chavez testified, among other things, that CashCall required consumers to make payments by automatic electronic debit (also known as electronic fund transfer) from the consumers' bank accounts. CashCall's second witness, Sean Bennett, was employed as a "business analyst" for CashCall. He testified that CashCall regularly called third parties to "make contact" even when CashCall had the consumers' correct contact information.

**Phase One Order: Judgment against CashCall for violations of the WVCCPA**

In its phase one order, the circuit court found that the State's witnesses were credible, the State's evidence was largely undisputed by CashCall, and the State's legal allegations were supported by the record.

4

As for the State's fifth cause of action, the circuit court found that, in order to obtain a loan, CashCall required each consumer to agree to make payments via automatic electronic debits from the consumer's bank account. The circuit court determined that this requirement stood in contravention of the policy established by the federal Electronic Transfer Act, 15 U.S.C. § 1693k, and therefore was an unfair and deceptive act or practice pursuant to 15 U.S.C. § 1693o(c). The circuit court further found that although CashCall told consumers that they could cancel the electronic debits at a later date, CashCall refused or resisted efforts made by consumers to cancel such debits. The circuit court also found that all of the nine defaulting consumer witnesses were harmed by the overdraft fees and involuntary closure of bank accounts caused by the wrongful electronic debits. In light of these findings, the circuit court concluded that requiring consumers to agree to electronic debits as a condition of obtaining a loan was an unfair or deceptive act or practice in violation of West Virginia Code § 46A-6-104.

In regard to the sixth cause of action, the court found that, based on the undisputed testimony of the State's representative consumer witnesses, CashCall engaged in a pattern of making unlawful threats to garnish wages and seize personal or real property in violation of West Virginia Code § 46A-2-124(e)(2)[6] and § 46A-6-104.[7]

Regarding the seventh cause of action, the circuit court found that, based on the undisputed testimony of the State's witnesses, CashCall violated West Virginia Code § 46A-2-124(f)[8] and § 46A-6-104 by threatening to take, and by taking, actions prohibited by the WVCCPA and other laws regulating a debt collector's conduct.

---

[6]West Virginia Code § 46A-2-124(e)(2) provides as follows:

No debt collector shall collect or attempt to collect any money alleged to be due and owing by means of any threat, coercion or attempt to coerce. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section . . . (e) The threat that nonpayment of an alleged claim will result in the . . . (2) Garnishment of any wages of any person or the taking of other action requiring judicial sanction, without informing the consumer that there must be in effect a judicial order permitting such garnishment or such other action before it can be taken.

[7]West Virginia Code § 46A-6-104 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

[8]West Virginia Code § 46A-2-124(f) provides as follows:

No debt collector shall collect or attempt to collect any money alleged to be due and owing by means of any threat, coercion or attempt to coerce. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section . . . (f) The threat to take any action prohibited by this chapter or other law regulating the debt collector's conduct.

5

As for the eighth and eleventh causes of action, the circuit court found that CashCall engaged in a pattern and practice of making repeated and continuous telephone calls, and making such calls at times it knew were inconvenient, with the intent of annoying, abusing, oppressing, or threatening consumers in violation of West Virginia Code § 46A-2-125(d).[9]

With regard to the ninth and twelfth causes of action, the circuit court found that the record was replete with undisputed testimony that CashCall unreasonably and unlawfully publicized information relating to consumers' alleged indebtedness to employers, relatives, and others in violation of West Virginia Code § 46A-2-126.[10]

Regarding the tenth cause of action, the circuit court found that CashCall unlawfully told consumers that it could collect fees and charges, such as charges for a threatened visit to a consumer's home or place of employment, in violation of West Virginia Code § 46A-2-127(g)[11] and § 46A-6-104.

As for the thirteenth cause of action, the circuit court found that CashCall made false threats of legal action to consumers including threats to initiate arbitration and threats of non-judicial seizure of property that were not intended under the law or were specifically prohibited by the law, in violation of West Virginia Code § 46A-2-124, § 46A-2-127, and § 46A-6-104.

With regard to the fourteenth cause of action, the circuit court found that CashCall engaged in unfair and deceptive acts or practices by representing to defaulting consumers that they were required to use a payment method that required a fee, such as a "MoneyGram," in violation of West Virginia Code § 46A-2-127 and § 46A-6-104.

---

[9]West Virginia Code § 46A-2-125(d) provides as follows:

No debt collector shall unreasonably oppress or abuse any person in connection with the collection of or attempt to collect any claim alleged to be due and owing by that person or another. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section . . . (d) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously, or at unusual times or at times known to be inconvenient, with intent to annoy, abuse, oppress or threaten any person at the called number.

[10]West Virginia Code § 46A-2-126 provides generally that "[n]o debt collector shall unreasonably publicize information relating to any alleged indebtedness or consumer."

[11]West Virginia Code § 46A-2-127 provides generally that "[n]o debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims or to obtain information concerning consumers." Subsection (g) further provides that "[a]ny representation that an existing obligation of the consumer may be increased by the addition of attorney's fees, investigation fees, service fees or any other fees or charges when in fact such fees or charges may not legally be added to the existing obligation[,]" violates this section.

6

Finally, with regard to the fifteenth cause of action, the circuit court found that CashCall's representation to consumers that it could charge a $15.00 non-sufficient fund ("NSF") fee to consumers when an electronic debit failed, and its charging of the $15.00 NSF fee, violated West Virginia Code § 46A-2-127(g), § 46A-2-128(c), § 46A-2-128(d), § 46A-6-104, and § 46A-7-111(1).

Based on these violations, the circuit court awarded the following to the Attorney General:

an injunction permanently prohibiting CashCall from violating the WVCCPA;

a $292,000.00 judgment to make restitution to the 292 West Virginia consumers ($1,000 for each consumer) for CashCall's unfair or deceptive acts outlined in Count Five of the Amended Complaint;[12]

a $1,000,000.00 judgment against CashCall to make restitution to the 292 consumers for CashCall's unlawful debt collection practices outlined in Counts Six through Fifteen of the Amended Complaint;[13]

a $1,000,000.00 judgment against CashCall as a civil penalty to be appropriated by the Legislature for repeated and willful violations of the WVCCPA as authorized by West Virginia Code § 46A-7-111(2); and

"costs, including reasonable attorney's fees" to be determined by the circuit court following the conclusion of the phase two portion of the case.

The circuit court also found that all loan contracts entered between CashCall and the West Virginia consumers were void and that any debts still owing were cancelled.

---

[12]Those wrongful acts included (a) requiring consumers to consent to automatic debits as a condition of obtaining a loan, (b) failing to disclose that accounts would be debited at least twice more if the first debit attempt failed; (c) failing to timely honor consumers' requests to stop or permanently stop debits, and (d) subjecting consumers to multiple overdraft fees.

[13]To enable the Attorney General to determine the amount of the restitution award to award to each of the 292 consumers, the circuit court ordered post-trial discovery that required CashCall to provide the Attorney General with reports showing each instance (1) where CashCall made or attempted to make an automatic electronic debit from a consumer's account; (2) where a consumer was charged a $15.00 NSF fee for a debit that failed to clear; and (3) where a consumer made a payment to CashCall by automatic electronic debit or other method—such as a MoneyGram—that required a fee.

**Phase Two Trial: Unlawful Lending and Usury**

During the phase two trial, the State produced evidence regarding its claims that CashCall made loans without a license from the Division of Banking (the State's second cause of action), was making usurious loans (the State's third cause of action), and violated the West Virginia Credit Services Organization Act, West Virginia Code § 46A-6C-2(a) (the State's fourth cause of action).[14]

Most of the testimony during the phase two trial regarded whether CashCall or FB&T was the true lender of the loans to the West Virginia consumers. Both parties agreed that if the circuit court found FB&T to be the true lender, then the State's claims that CashCall was making loans without a license and making usurious loans would be preempted by federal law.

The State's only witness in support of its claim that CashCall was the true lender was Attorney Margot Saunders, a long-time employee of the National Consumer Law Center. The Attorney General disclosed Ms. Saunders as an expert witness prior to trial. However, the circuit court held in abeyance its ruling regarding whether Ms. Saunders qualified as an expert pending its entry of the phase two order.

During its case-in-chief, CashCall offered the testimony of only one witness, its general counsel, Dan Baren, who testified that he was in charge of CashCall's regulatory matters and litigation, and had negotiated most, if not all, of the major contracts between CashCall and its financing partners such as FB&T. Among other things, Mr. Baron testified that Petitioner J. Paul Reddam was obligated to personally guarantee all of CashCall's obligations to FB&T under the parties' agreements.

---

[14]The West Virginia Credit Services Organization Act lists those who must register as credit services organization. Specifically, West Virginia Code § 46A-6C-2(a) defines a "credit services organization" as follows:

> A person who, with respect to the extension of credit by others and in return for
> the payment of money or other valuable consideration, provides, or represents that
> the person can or will provide, any of the following services:
> (1) Improving a buyer's credit record, history or rating;
> (2) Obtaining an extension of credit for a buyer; or
> (3) Providing advice or assistance to a buyer with regard to subdivision (1) or (2)
> of this subsection.

The circuit court found that it was not necessary to decide whether CashCall was violating the West Virginia Credit Services Organization Act because CashCall was found to be the de facto lender of the loans in this case. Nevertheless, the circuit court found that CashCall would not have been exempt from the Credit Services Organization Act.

**Phase Two Order: Judgment against CashCall for violations of the WVCCPA**

In the phase two order, entered September 10, 2012, the circuit court found that, based upon its review of Margot Saunders's testimony and her professional experience, she was "qualified to testify as an expert witness on the subject of consumer lending." The court further found that

> Ms. Saunders's expertise in the field of predatory lending, particularly her analysis of contracts and relationships between lenders and brokers, *qualifies her to testify about the contracts and agreements between CashCall and [FB&T]* and to assist the Court in determining those parts of the Agreement that show which party bore the economic risk as between CashCall and [FB&T] in regards to the subject consumer loans.

(Emphasis added.)

With regard to the agreements between FB&T and CashCall, the circuit court found that numerous provisions of CashCall's agreements with FB&T placed the entire monetary burden and risk of the loan program on CashCall, and not on FB&T. The court also found that CashCall paid FB&T more for each loan than the amount actually financed by FB&T. The court further found that

> [p]resumably, CashCall agreed to such terms on the belief that its business scheme would successfully evade state usury laws and it could reap the benefits of the excessive interest rates charged on each loan. Furthermore, CashCall had to procure the personal guarantee of its sole owner and stockholder, J. Paul Reddam, to personally guarantee all of CashCall's financial obligations to the [FB&T], including the amounts of the loans prior to "purchase" by CashCall. Also, CashCall had to indemnify [FB&T] against all losses arising out of the Agreement, including claims asserted by borrowers. CashCall was under a contractual obligation to purchase the loans originated and funded by [FB&T] only if CashCall's underwriting guidelines were followed when approving the loan. [Finally, for] financial reporting purposes, CashCall treated such loans as if they were funded by CashCall.

Based on these findings, the circuit court concluded that CashCall, and not FB&T, was the de facto or true lender of the loans to the West Virginia consumers. Having made this baseline determination, the circuit court then ruled, as follows, on the State's unlawful lending and usury claims:

> CashCall was not the agent of FB&T, but was an independent contractor.

> The purpose of the lending program was to allow CashCall to hide behind the FB&T's South Dakota charter and FB&T's resulting right to export interest rates under federal banking law, as a means for CashCall to deliver its loan product to states like West Virginia, who have lender licensing and usury laws.

9

The maximum allowable interest rate under West Virginia law for the loans in question was eighteen percent. Therefore, the loans made by CashCall to West Virginia consumers greatly exceeded the maximum allowable interest rates under West Virginia law and were, therefore, usurious.

CashCall made loans in West Virginia, directly or indirectly, without obtaining a business registration certificate from the West Virginia Tax Department, in violation of West Virginia Code § 46A-7-115.

CashCall has engaged in unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-104 because it made and collected usurious loans and excess charges without a license.

CashCall repeatedly and willfully violated West Virginia Code § 46A-7-115 (making loans in West Virginia without a license) and §46A-6-104 (unfair or deceptive acts or practices) and therefore warranted a civil penalty of up to $5,000 for each violation, as set forth in West Virginia Code § 46A-7-111(2).

Based on these findings, the circuit court

permanently enjoined CashCall from violating the WVCCPA;

imposed a civil penalty against CashCall for making loans without a license in the amount of $730,000 to be appropriated by the Legislature;

imposed a civil penalty against CashCall for engaging in unfair/deceptive acts and for making/collecting usurious loans in the amount of $730,000 to be appropriated by the Legislature;

awarded a $10,045,687.96 judgment against CashCall (four times the amount of interest the 292 consumers agreed to pay on their loan) to be distributed to the consumers by the Attorney General;

found that all loan contracts entered between CashCall and West Virginia consumers were void and any debts still owing were cancelled; and

awarded "costs, including its reasonable attorney's fees."

CashCall filed this appeal of the circuit court's phase one and phase two orders on October 10, 2012.[15]

---

[15]On October 12, 2012, the circuit court denied CashCall's motion to stay the phase one and phase two orders.

10

## Post-Trial Award of Attorney's Fees

Following the filing of this appeal, the Attorney General filed an "Application For Fees and Expenses" with the circuit court on November 9, 2012, that sought an award of attorney's fees for the 1,175.9 hours that Assistant Attorney General Norman Googel worked on the case, and for the 282 hours Assistant Attorney General Doug Davis worked on the case, plus expenses. On December 18, 2012, CashCall filed a written response in which it argued that the requested fees were unreasonable and unsupported by the evidence. CashCall also preserved the arguments set forth in its appellate brief regarding attorney's fees to avoid any inference of waiver regarding these arguments.

On December 21, 2012, the circuit court conducted an evidentiary hearing on the State's motion for attorney's fees. The State's witnesses included Mr. Googel, Mr. Davis, and Attorney Bren Pomponio, who testified as an expert witness on the reasonable and customary fees awarded to lawyers in consumer law cases in West Virginia.

On January 11, 2013, CashCall filed its appellate brief and appendix record with this Court. In its brief, CashCall argued that the circuit court erred by awarding the State its attorney's fees as costs in the absence of express statutory or constitutional authority.[16]

Thereafter, CashCall submitted a memorandum of law to the circuit court that proposed a $64,950.00 award of attorney's fees for Mr. Davis's work on the case. The offer was based upon Mr. Davis's experience and the time sheets he had maintained throughout the pendency of the case. However, CashCall asked the circuit court to deny the State's motion for an award of attorney's fees for Mr. Googel's work because he had failed to keep contemporaneous time records during the case. CashCall further argued that the non-contemporaneous time estimations Mr. Googel had created after the circuit court had entered its phase one and phase two orders were inaccurate and unreliable.

On March 18, 2013, the circuit court entered its "Final Order Awarding Fees and Costs" that awarded the State a total of $446,180 in attorney's fees ($349,825 for Mr. Googel and $96,355 for Mr. Davis), plus $9,789.94 in expenses. The award was based on a $350 per hour rate for each attorney. The circuit court acknowledged that Mr. Googel did not keep contemporaneous time records and, therefore, discounted the hours he claimed by fifteen percent. The court also found that, although CashCall had not engaged in conduct amounting to bad faith, it had engaged in vexatious and oppressive conduct particularly in refusing to produce discovery materials in electronic form. However, the circuit court stayed its "Final Order Awarding Fees and Costs" until such time as this Court issues its opinion in the instant appeal.

On April 17, 2013, CashCall filed a motion with this Court to supplement the appendix record and to submit supplemental briefing regarding the circuit court's award of attorney's fees.

---

[16]Although the circuit court had not yet awarded the amount of attorney's fees CashCall would be required to pay to the Attorney General, the circuit court awarded "costs, including its reasonable attorney's fees" in both the phase one and phase two orders.

On July 18, 2013, the Court granted the motion. Thereafter, both parties filed supplemental briefs and CashCall supplemented the record.

CashCall now appeals all three of the circuit court's orders in this case. On appeal, CashCall raises multiple assignments of error. The first three of these assignments of error address the circuit court's September 10, 2012, phase one order regarding the Attorney General's claims of unfair debt collection. The next six assignments of error (numbers four through nine) address the circuit court's September 10, 2012, phase two trial order regarding the Attorney General's claims of unlawful lending and usury. Finally, the last five assignments of error (numbers ten through fourteen) address the circuit court's March 18, 2013, order awarding attorney's fees as costs in favor of the Attorney General.

**Discussion**

**A. Assignments of error relating to the phase one trial**

We begin our analysis by addressing petitioner's three assignments of error relating to the phase one trial and the Attorney General's claims of unfair debt collection.

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

CashCall first argues that the circuit court erred in awarding relief to consumers because the Attorney General has no authority under the WVCCPA to bring an action or pursue damages on behalf of consumers. CashCall highlights that in the phase one order, the circuit court awarded restitution and penalty damages to the State to be distributed to the West Virginia consumers pursuant to Article 5 of the WVCCPA. West Virginia Code § 46A-5-101(1) provides that a "consumer" may bring an action for civil liabilities and penalties. Further West Virginia Code § 46A-1-102(12) defines a "consumer" as "a natural person who incurs debt pursuant to a consumer credit sale or a consumer loan, or debt . . . [.]" Therefore, CashCall claims that the Attorney General has no statutory authority under Article 5 to bring an action or to pursue damages on behalf of a "consumer" because the State is not a natural person.

West Virginia Code § 46A-7-108 provides that "[t]he attorney general may bring a civil action to restrain a person from violating this chapter and for other appropriate relief." This Court in *State By and Through McGraw v. Imperial Marketing*, 203 W. Va. 203, 506 S.E.2d 799 (1998), examined the Attorney General's authority to seek consumer restitution and other equitable remedies in its enforcement actions and held that "the phrase 'other appropriate relief' in W.Va. Code, 46A-7-108 [1974], 'indicates that the legislature meant the full array of equitable relief to be available in suits brought by the Attorney General.'" *Id.* at 215-16, 506 S.E.2d at 811-

12. Therefore, a circuit court may, under § 46A-7-108, award the State a full array of equitable relief.

The WVCCPA also authorizes the Attorney General to bring a civil action against a creditor "for making or collecting charges in excess of those permitted by this chapter." W. Va. Code § 46A-7-111(1). Therefore, a circuit court may order a full refund of such excess charges. However, where the excess charge was imposed in a deliberate violation of, or in reckless disregard for, the WVCCPA, or where a creditor refused to refund an excess charge within a reasonable time after demand by the consumer or the Attorney General, the circuit court may order the creditor to pay to the consumer up to ten times the amount of the excess charge. *Id.* Further, West Virginia Code § 46A-7-111(2) provides that the Attorney General may recover a civil penalty of up to $5,000.00 for each violation of the WVCCPA where "the defendant has engaged in a course of repeated and willful violations of this chapter." "[T]his Court has defined that term [willful] to mean conduct that is intentional. . . : 'Intending the result which actually comes to pass; design; intentional; not incidental or involuntary.'" *State ex rel. Koontz v. Smith*, 134 W.Va. 876, 882, 62 S.E.2d 548, 551(1950) (citing *Black's Law Dictionary* (3rd ed. 1948))." *State v. Saunders*, 219 W. Va. 570, 575, 638 S.E.2d 173, 178 (2006) (internal citations omitted).

Further, West Virginia Code § 46A-5-105 provides that "the court may cancel the debt when the debt is not secured by a security interest" in those instances where the "creditor has willfully violated the provisions of this chapter applying to illegal, fraudulent or unconscionable conduct or any prohibited debt collection practice." Thus, the public policy embodied in West Virginia Code § 46A-5-105 authorizes the court to cancel the debt in enforcement actions under its power to grant equitable relief.

In light of these statutory provisions and our holding in *Imperial Marketing*, we find that the circuit court did not err by granting monetary relief to the State that is to be distributed by the Attorney General to individual consumers. Nor did the circuit court err in cancelling the 292 consumers' unsecured debts to CashCall. The civil penalties authorized by West Virginia Code § 46A-7-111 and paid to the State do not inure to the State alone. Although such a civil penalty must first be paid to the State, a governmental entity may distribute funds obtained as civil penalties as compensation for pecuniary loss to injured persons. *See, e.g., U.S. Dept. of Housing & Urban Development v. Cost Control Marketing & Sales Management of Virginia, Inc.*, 64 F.3d 920, 928 (4th Cir. 1995). Thus, under its equitable powers, the circuit court may authorize the State to distribute a civil penalty to aggrieved consumers.

CashCall's second assignment of error is that the circuit court erred in basing its award of damages on the State's summary exhibits because they were "unauthenticated" and contained "unreliable and inadmissible evidence."

We have said, "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syllabus point 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998)." Syl. Pt. 11, *State v. White*, 228 W.Va. 530, 722 S.E.2d 566 (2011).

13

We first note that at the start of the phase one trial, the Attorney General and CashCall stipulated that their Joint Exhibit Number One was an accurate summary of CashCall's 292 West Virginia consumers' accounts. That exhibit provided the following information for each West Virginia consumer: the amount financed, the finance charge, the principle paid, the interest paid, the total fees paid, the "overall" paid, the number of payments made, the date of the note, the date of last payment, the total number of payments necessary to fulfill the loan, and the loan's current status. Hence, CashCall made no objection below regarding the information contained in Joint Exhibit Number One.

We also note that CashCall's decision to produce its customer records primarily in a paper-copy format, as opposed to the requested easily-searchable electronic format, necessitated, in part, the summary exhibits of which CashCall now complains.

With regard to Exhibit A (listing the types of letters sent by CashCall to West Virginia consumers) and Exhibit B (summarizing the number of phone calls made by CashCall to West Virginia consumers), CashCall's counsel stated during the phase one trial that he had reviewed both exhibits by focusing on those consumers who were identified by the State as trial witnesses. CashCall's counsel then said "there are certain aspects that appear to be pretty close, although they are not perfect, but perfection is not required to be sure. Other aspects of it are quite imperfect, but we're happy to discuss that further." However, it appears that the only time CashCall discussed these alleged imperfections further was during its cross-examination of Ms. Gray, who prepared Exhibit A, and Ms. White, who prepared Exhibit B. Importantly, during those cross-examinations, CashCall had the opportunity to enter any and all relevant evidence regarding alleged discrepancies between its records and the information found in Exhibits A and B.

During its cross-examination of Ms. Gray, CashCall pointed to only three errors in Exhibit A. Those errors were immediately corrected by agreement of the parties in the presence of the court. Once those corrections were made, CashCall made no further objection to the circuit court with regard to Exhibit A.

During its cross-examination of Ms. White regarding her preparation of Exhibit B, CashCall clarified that Exhibit B included (1) calls made by CashCall, but not received by a consumer (such as when a call resulted in a busy signal), and (2) calls that were not collection calls, such as CashCall's standard pre-loan employment verification call. These issues were the only issues raised by CashCall during its cross-examination of Ms. White regarding Exhibit B. However, at the end of testimony on October 31, 2011, CashCall's counsel indicated that "on the volume of calls issues . . . we do plan to go back and create something . . . that would be more accurate as an account . . . ." However, CashCall never produced its own summary to rebut Exhibit B, even though the circuit court gave it the opportunity to do so. Importantly, in the order on appeal, the circuit court found Exhibit B to be "substantially accurate" and therefore sufficient to enable it to make the following findings of fact regarding CashCall's collection practices:

24. The testimony of the State's witnesses concerning the volume of calls is consistent with the data produced by CashCall and compiled by the State in

14

Summary Ex[hibit] A. Overall, the [c]ourt finds all of the State's consumer witnesses to be credible. . . .

. . . .

26.    The State's evidence of the volume and pattern of CashCall's calls is largely undisputed by CashCall and, in fact, is wholly supported by the documents CashCall produced during discovery. Although Ms. Chavez indicated that some of the outbound calls counted by the State may have been "welcome calls" or other non-collection calls, it is equally likely that the State failed to count other collection calls due to the occasional difficulty in deciphering CashCall's service logs. The Court finds that the number of calls as reported by the State in Summary Ex[hibit] B is substantially accurate to enable the [c]ourt to pass judgment on CashCall's collection practices.

On this record, we cannot say that the circuit court abused its discretion in admitting Exhibits A and B into evidence or in relying on them in making its findings.

CashCall's third assignment of error is that the circuit court erred in finding that the State's consumer witnesses were representative of all 292 West Virginia consumers. CashCall claims the State's witnesses had "vastly different experiences" and that "none of the ten witnesses presented testimony justifying [a] claim for unfair collection practices[.]" Conversely, the circuit court, in its phase one order, described the testimony of the State's representative witnesses as remarkably consistent in regard to CashCall's unfair debt collection practices. For example, the circuit court found as follows:

20.    The [c]ourt finds a remarkable consistency in the testimony provided by the State's ten witnesses concerning their experiences with CashCall. All of the witnesses who obtained loans from CashCall testified that they were required to agree to automatic debits from their accounts as a condition of receiving the loan.[] All of the consumers who obtained loans from CashCall reported that they were harmed by the requirement of making payments by automatic debits. Each of them was charged overdraft fees by their banks when CashCall's debits failed to clear. Many of them contacted CashCall to ask that the debits be stopped, but did not succeed in doing so. Many of them reported that CashCall debited their account on dates other than the date agreed upon, usually an earlier date, which caused the debit to bounce. Many of them also reported that CashCall would try again to debit their account multiple times after the initial debit bounced, sometimes on the same day or within the first two to three days. The end result for each person was the involuntary closure of their account by their bank, closure of the account by the consumer, or a permanent stop payment order from their bank prohibiting further debits by CashCall.

21.    The consumers' accounts of alleged telephone harassment by CashCall were also remarkably similar. All of the consumers reported having received a high volume of telephone calls from CashCall, including large numbers of calls

15

per day, high volumes of calls over a period of weeks and months, and multiple telephone calls at their places of employment which continued even after they asked CashCall to stop. Most of the consumers testified that CashCall had contacted other parties to leave messages for them to call CashCall, even though each one of them had the same mailing address and telephone numbers throughout their dealings with CashCall. Several consumers also testified that CashCall disclosed their alleged account delinquency when calling third-parties.

22.     The consumers also testified that CashCall's repeated and continued calls to their places of employment interfered with their work, created friction with their employers, and caused them to suffer embarrassment and humiliation in front of their supervisors and co-employees. . . . Collectively, the consumers testified about having received many types of threats from CashCall over the telephone, including threats of arbitration proceedings, legal action, garnishment of wages, loss of home and other property, threats to contact their employer in person or over the phone, and threats to visit consumers at their places of employment or at their homes.

With regard to CashCall's claim that the circuit court erred in extrapolating the experience of the Attorney General's representative consumer witnesses to the pool of all 292 West Virginia consumers, CashCall fails to cite to the location in the approximately 6,000 page record on appeal where it objected to the State's use of representative witnesses.[17] Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure provides, in part, as follows:

The argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

We have said,

It is counsel's obligation to present this Court with specific references to the designated record that is relied upon by the parties . . . In this context, counsel must observe the admonition of the Fourth Circuit that "'[j]udges are not like pigs, hunting for truffles buried in briefs' [or somewhere in the lower court's files]. . . . We would in general admonish all counsel that they, as officers of this Court, have a duty to uphold faithfully the rules of this Court." *Teague v. Bakker*, 35 F.3d 978, 985 n. 5 (4th Cir.1994), quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991).

[17]During the phase one trial CashCall's counsel did object to the fact that the State's witnesses at trial were, with one exception, not the same consumers identified in the State's complaint against CashCall. CashCall also objected to what it claimed was insufficient notice of the names of the witnesses. However, the circuit court did not rule on these objections.

*State v. Honaker*, 193 W.Va. 51, 56 n. 4, 454 S.E.2d 96, 101 n. 4 (1994). In failing to object, CashCall has waived this issue on appeal. That said, the circuit court had before it Joint Exhibit Number One and Exhibits A and B which provided detailed information regarding CashCall's relationship with each of the 292 West Virginia consumers. Thus, the circuit court had the ability to review these documents, with CashCall's arguments in mind, to determine whether the testimony of the State's witnesses was, in fact, representative of the 292 West Virginia consumers. On this record, we cannot say that the circuit court erred in relying upon the testimony of the State's representative consumer witnesses.

## B. Assignments of error relating to the phase two trial

We continue our analysis by addressing CashCall's next six assignments of error (numbers four through nine) relating to the Attorney General's claims of unlawful lending and usury.

CashCall's fourth assignment of error is that the circuit court erred by applying a "predominant economic interest" test to determine whether CashCall or FB&T was the true lender of the loans made to the West Virginia consumers. That test examines which party—as between a bank, such as FB&T, and a non-bank entity, such as CashCall—has the predominant economic interest in loans made by the bank. CashCall argues that the circuit court should have applied instead what it calls the "federal law test" found at West Virginia Code § 46A-1-102(38).[18] That section, which defines the term "regulated consumer loan," exempts from regulation any consumer loan that "qualifies for federal law preemption from state interest rate limitations." CashCall contends that if the circuit court had applied the "federal law test," it would have found that FB&T was the true lender because FB&T's consumer loans qualified for federal law preemption from state interest rate limitations.

In support of its argument, CashCall highlights that the Fourth Circuit Court of Appeals applied the criteria found in the "federal law test" in *Discover Bank v. Vaden* and found that a true lender is (1) the entity in charge of setting the terms and conditions of a loan, and (2) the entity who actually extended the credit. 489 F.3d 594, 601-03 (4th Cir.2007), *rev'd on other grounds*, 556 U.S. 49 (2009). *See also Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 923 (8th Cir. 2000). CashCall therefore claims that, in accordance with *Vaden*, FB&T was the true lender of the loans in this case because FB&T set the terms and conditions of the loans to the West Virginia consumers and actually extended credit to those consumers.

---

[18]West Virginia Code § 46A-1-102(38) provides as follows: "'Regulated consumer loan' means a consumer loan, including a loan made pursuant to a revolving loan account, in which the rate of the loan finance charge exceeds eighteen percent per year as determined according to the actuarial method, except where the loan qualifies for federal law preemption from state interest rate limitations, including federal law bank parity provisions, or where the lender is specifically permitted by state law other than article four of this chapter to make the loan at that rate without a requirement the lender hold a regulated consumer lender license."

This Court provided a roadmap for resolving usury questions in *Carper v. Kanawha Banking & Trust Co.*, 157 W. Va. 477, 207 S.E.2d 897 (1974). In Syllabus Point 4 of *Carper*, the Court said as follows:

> The usury statute contemplates that a search for usury shall not stop at the mere form of the bargains and contracts relative to such loan, but that all shifts and devices intended to cover a usurious loan or forbearance shall be pushed aside, and the transaction shall be dealt with as usurious if it be such in fact. *Crim v. Post*, 41 W.Va. 397, 23 S.E. 613 (1895).

*Id.* at 478, 207 S.E.2d 901. In the phase two order, the circuit court cited to *Carper.* The circuit court then cited to cases in which federal courts applied the "predominant economic interest" test in rent-a-bank cases such as this, where a state usury case against a non-bank entity is removed to federal court on federal preemption grounds. *See Goleta Nat. Bank v. Lingerfelt*, 211 F.Supp.2d 711(E.D.N.C. 2002); *Colorado ex rel. Salazar v. Ace Cash Exp., Inc.*, 188 F.Supp.2d 1282 (D.Colo. 2002); *Flowers v. EZPawn Oklahoma, Inc.*, 307 F.Supp.2d 1191(N.D.Okla. 2004). In these cases, most of which involve payday lenders, the federal courts found no federal preemption and remanded the case back to the state court. However, the circuit court noted that, on remand, most cases settled and, therefore, were not adjudicated on the merits.[19]

Based on this line of cases, the circuit court concluded that the "predominant economic interest" test was the proper standard to determine the true lender in this case.

We agree with the circuit court's decision. The "federal law test" advocated by CashCall examines only the superficial appearance of CashCall's business model. Further, if we were to

---

[19]State courts have also applied the "predominant economic interest" test in deciding cases on the merits. For example, in *Spitzer v. County Bank of Rehoboth Beach*, 846 N.Y.S.2d 436 (N.Y. App. Div. 2007), New York's Attorney General brought an enforcement action against payday lenders who had entered into rent-a-bank arrangements. In *Spitzer*, the Attorney General alleged that the payday lenders were the true lenders and that their agreements with a rent-a-bank were a scheme to circumvent New York's usury laws. The *Spitzer* court noted that the payday lenders purchased ninety-five percent of each of the bank's loans, assumed all risks of the loans, and indemnified the bank against any loss arising from a loan transaction. The *Spitzer* court then found that a totality of the circumstances must be used to determine the identity of the "true lender," with the key factor being who had the predominant economic interest in the transactions. Id. at 438-39. Ultimately, the bank and the payday lender in *Spitzer* entered into a $5.2 million settlement agreement with New York's Attorney General. *See also Andrews v. Cramer*, 629 N.E.2d 133, 136 (Ill.App. 1993) ("The question [of whether a loan is usurious] is determined by considering the nature and substance of the transaction, rather than its form, to guard against a lender violating the statute through the use of ingenious schemes and devices."); *Ghirardo v. Antonioli*, 883 P.2d 960, 965 (Cal. 1994) (citations omitted) (stating that the trier of fact must look to the substance of the transaction, rather than its form, and must determine whether such form was mere sham and subterfuge to cover up usurious transactions); *Williams v. Powell*, 216, 447 S.E.2d 45, 48 (Ga.App. 1994) ("[T]he courts will permit no scheme or device, by whatever name, to hide . . . any contrivance to evade the usury laws. . . .").

apply the "federal law test" as CashCall advocates, we would always find that a rent-a-bank was the true lender of loans such as those at issue in this case. Therefore, in light of our holding in *Carper*, and the cases cited above, we find that the circuit court did not err in applying the "predominant interest test" as a means of examining the substance, and not just the form, of CashCall and FB&T's marketing agreements. As for the two cases on which CashCall relies, *Vaden* and *Krispen*, they are easily distinguishable from the instant case because, in both cases, the non-bank entity was a corporate affiliate of the bank. In contrast, CashCall and FB&T are completely separate entities, or, as the circuit court noted, "independent contractors to each other in performing their respective obligations [under the agreement]." In fact, both the federal court in its remand order, and the circuit court in the order on appeal, rejected CashCall's arguments based on *Vaden* and *Krispen*.

CashCall's fifth assignment of error is that the trial court erred in relying on the opinions expressed by the State's expert witness, attorney Margot Saunders of the National Consumer Law Center. CashCall claims that Ms. Saunders usurped the role of the court by testifying as to the nature of the relevant law and how the court should apply that law. CashCall also claims that the circuit court erred in allowing Ms. Saunders to testify about the parties' marketing agreements because she was not directly qualified as an expert on that issue.

We have said,

"""""Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused." Point 5, syllabus, *Overton v. Fields*, 145 W.Va. 797 [117 S.E.2d 598 (1960) ].' Syllabus Point 4, *Hall v. Nello Teer Co.*, 157 W.Va. 582, 203 S.E.2d 145 (1974)." Syllabus Point 12, *Board of Education v. Zando, Martin & Milstead*, 182 W.Va. 597, 390 S.E.2d 796 (1990).' Syl. pt. 3, *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993)." Syllabus Point 5, *Mayhorn v. Logan Medical Foundation*, 193 W.Va. 42, 454 S.E.2d 87 (1994).

Syl. Pt. 2, *Kiser v. Caudill*, 210 W.Va. 191, 193, 557 S.E.2d 245, 247 (2001). Further, "Rule 702 of the West Virginia Rules of Evidence is the paramount authority for determining whether or not an expert is qualified to give an opinion. . . ." Syl. Pt. 6, in part, *Mayhorn v. Logan Med. Found.*, 193 W.Va. 42, 454 S.E.2d 87 (1994). Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

Based on the uncontested facts in the record, the circuit court made numerous findings with regard to its qualification of Ms. Saunders as an expert in consumer lending. For example, the circuit court found that Ms. Saunders has twenty years of experience as an attorney with the National Consumer Law Center; has been qualified as an expert in the fields of predatory lending, credit reporting, debt collecting, electronic commerce and benefits transfer, preservation of home ownership, credit math, electronic transaction issues, utility costs for low income households, and other consumer credit issues; has provided written and oral testimony to

Congress; and has served as an expert witness in twenty-nine cases involving mortgage lending, consumer credit, and predatory lending. On this record, we cannot say that the circuit court erred in qualifying Ms. Saunders as an expert in consumer lending.

We next turn to CashCall's claim that the circuit court erred in allowing Ms. Saunders to testify about CashCall and FB&T's marketing agreements because the court allegedly did not directly qualify her as an expert on that issue. Although the circuit court did not specifically state that Ms. Saunders was an "expert" with regard to agreements such as the one between CashCall and FB&T, it specifically found that "Ms. Saunders' expertise in the field of predatory lending, particularly her analysis of contracts and relationships between lenders and brokers, *qualifies her to testify about the contracts and agreements between CashCall and [FB&T]* and to assist the Court in determining those parts of the Agreement that show which party bore the economic risk as between CashCall and [FB&T] in regards to the subject consumer loans." (Emphasis added.) Therefore, we find that the circuit court did not err in allowing Ms. Saunders to opine about a topic it specifically found her qualified to address.

All of that having been said, in the phase two order, the circuit court stated that even if it had concluded that Ms. Saunders was not qualified to offer an expert opinion on the subject of consumer lending and the relationship between CashCall and FB&T, it would have concluded that the agreements between CashCall and FB&T fully supported its finding that CashCall was the true lender of the subject loans. Therefore, we find CashCall's fifth assignment of error to be devoid of merit.

CashCall's sixth assignment of error is that the circuit court erred in applying a "state test" (the "predominant economic interest" test) in deciding a question regarding federal preemption. CashCall claims that the only test capable of determining this federal question is the "federal law test."

First, the federal question posed by petitioner—whether federal law preempted the issues in this case—was answered by the federal district court in the negative. The circuit court implicitly adopted the federal district court's conclusion. Second, we addressed CashCall's allegation regarding the circuit court's use of the "predominant economic interest" test in its fourth assignment of error above and found it wanting.[20] Hence, we find CashCall's sixth assignment of error to be without merit.

CashCall's seventh assignment of error is that the circuit court erred by imposing punitive penalties against CashCall even though CashCall did not willfully violate the WVCCPA. CashCall highlights that West Virginia Code § 46A-7-111 provides that the attorney general may bring an action to recover a civil penalty only for *willful* violations of this chapter. CashCall claims that its actions were not willful because it had the good faith belief that its activities complied with West Virginia law. CashCall's "good faith belief" is based on an e-mail it received in 2006 from a staff lawyer employed by the Division of Banking that stated CashCall

---

[20]Ironically, what petitioner nominates as the "federal law test" is found in state law at West Virginia Code § 46A-1-102(38), and what it calls a "state test," the predominant economic interest test, has been applied, as noted above, by federal courts.

did not require a lending license "because the loans being assigned were not 'regulated customer loans' as defined by [West Virginia Code] § 46A-1-102" and thus were not subject to West Virginia law.

The subject e-mail was sent to CashCall in response to an e-mail sent by CashCall's counsel, Dan Baren, on July 28, 2006. In his e-mail, Mr. Baren wrote the following:

Hi -Thanks for taking time to address this issue.

As I stated on the phone, my question was whether a California company would need to obtain a license from the Commissioner to take assignments and service unsecured consumer loans that were originated by a financial institution which itself was exempt from the licensing requirement.

I would like to conclude that licensing would not be required because the loans being assigned were not 'regulated consumer loans' as that term is defined in Section 46A-l-102.

Please let me know your position on this matter. Thank you very much.

Clearly, the staff attorney's response that "[l]icensing is not required because the loans being assigned were not 'regulated consumer loans' as defined in 46A-1-102[,]" was based on the implication in Mr. Baren's e-mail that the "financial institution" (i.e., FB&T) was the lender of the loans in question. However, CashCall was, in fact, the true lender of the loans in question. Therefore, CashCall cannot rely on the e-mail as a defense. Further, CashCall fails to cite to any evidence in the record on appeal that the staff attorney who sent the responsive e-mail had any authority to bind the State with her response.

The circuit court's award of punitive damages was based on its lengthy and detailed findings regarding CashCall's repeated violations of the WVCCPA. These findings are amply supported by the record on appeal. Accordingly, we find that the circuit court did not err in concluding that CashCall's violations of the WVCCPA were willful, or in imposing punitive penalties against CashCall for those willful violations.

CashCall next claims that the circuit court's award of punitive penalties violates CashCall's fundamental due process right to notice of conduct subject to punishment because it could not have known in 2006 and 2007, when it purchased loans made by FB&T to West Virginia consumers, that the circuit court would reject the statutorily-adopted "federal law test" and instead apply a "predominant economic interest" test.

This Court decided *Carper v. Kanawha Banking & Trust Co.* in 1974, long before CashCall began purchasing FB&T's loans to West Virginians in 2006. In that seminal case, we said that the "search for usury shall not stop at the mere form of the bargains and contracts relative to such loan." Therefore, CashCall was clearly on notice that this Court would examine an agreement, such as the agreements between CashCall and FB&T, for its substance and not merely for its form. Therefore, we find CashCall's lack of notice claim to be without merit.

21

Finally, CashCall argues that, even if the award of punitive damages did not violate its due process rights, the Attorney General was estopped from seeking a penalty against CashCall because CashCall relied to its detriment on that statement in the Division of Banking's e-mail. However, as we said previously, this argument is without merit because the e-mail from the employee at the Division of Banking did not bind the State and, importantly, was based on CashCall's misleading assertions that FB&T was the true lender of the loans mentioned in the e-mail.

CashCall's eighth assignment of error is that the circuit court erred by awarding the State a $10,045,687.96 civil penalty[21] pursuant to West Virginia Code § 47-6-6, because only a borrower or debtor may bring a claim under West Virginia Code § 47-6-6. That section provides as follows:

> All contracts and assurances made directly or indirectly for the loan or forbearance of money or other thing at a greater rate of interest than is permitted by law shall be void as to all interest . . . and *the borrower or debtor* may, in addition, recover from the original lender or creditor or other holder not in due course an amount equal to four times all interest agreed to be paid . . . . Every usurious contract and assurance shall be presumed to have been willfully made by the lender or creditor, but a bona fide error, innocently made, which causes such contract or assurance to be usurious shall not constitute a violation of this section if the lender or creditor shall rectify the error within fifteen days after receiving notice thereof.

(Emphasis added.) CashCall highlights that the "Attorney General's powers are limited to those specifically conferred by statute." *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W.Va. 770, 777, 461 S.E.2d 516, 523 (1995). Therefore, CashCall argues that, because the Attorney General is not a borrower or a debtor pursuant to West Virginia Code § 47-6-6, he lacks authority to seek or be awarded damages on behalf of the 292 West Virginia consumers. Put more simply, CashCall argues that the Attorney General was not authorized to seek, and the trial court was not authorized to award, a penalty for usury to the State under West Virginia Code § 47-6-6.

We reject this argument because CashCall has mischaracterized the circuit court's ruling. The circuit court did not issue the ruling pursuant to West Virginia Code § 47-6-6. Instead, it relied upon the public policy established by West Virginia Code § 47-6-6—that the penalty for usury should be four times the amount of interest agreed to be paid—to determine the amount of the civil penalty. Therefore, West Virginia Code § 47-6-6 merely served as a guide to determine the appropriate amount of the restitution award for this violation. In actuality, the award was authorized as an excess charge under West Virginia Code § 46A-7-111, which provides that when a circuit court finds that an excess charge has been made, it must order a full refund of the excess charge to consumers. Further, pursuant to West Virginia Code § 46A-7-111, where an

---

[21]$10,045,687.96 is four times the amount of all of the interest agreed to be paid by all of the 292 West Virginia consumers.

22

excess charge was recklessly or deliberately made, a circuit court may award a civil penalty of up to *ten times* the excess charge:

(1) After demand, the attorney general may bring a civil action against a creditor for making or collecting charges in excess of those permitted by this chapter. *If it is found that an excess charge has been made, the court shall order the respondent to refund to the consumer the amount of the excess charge. If a creditor has made an excess charge in a deliberate violation of or in reckless disregard for this chapter, or if a creditor has refused to refund an excess charge within a reasonable time after demand by the consumer or the attorney general, the court may also order the respondent to pay to the consumer a civil penalty in an amount determined by the court not in excess of the greater of either the amount of the sales finance charge or loan finance charge or ten times the amount of the excess charge.* Refunds and penalties to which the consumer is entitled pursuant to this subsection may be set off against the consumer's obligation. . . . If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability to pay a penalty shall be imposed under this subsection.

(Emphasis added.) An unlawful or excessive interest charge or fee constitutes an "excess charge" as defined by West Virginia Code § 46-7-111(1).

Courts have broad powers to fashion equitable relief. *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946). Moreover, a court's equitable powers assume an even broader, more flexible character when the public interest is involved in a proceeding in order to secure complete justice. *Id.* at 398 (emphasis added). As the *Porter* court explained:

[T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. "The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction."

*Id.* Likewise, a West Virginia trial court is empowered by the principles of equity to grant equitable relief to consumers as a means of securing complete justice and accomplishing the manifest public protection purposes of the WVCCPA. Therefore, we find that the circuit court did not err by awarding a civil penalty to be distributed by the Attorney General to individual consumers aggrieved by CashCall's usury.

CashCall's ninth assignment of error is that the circuit court erred by awarding the Attorney General a $730,000.00 civil penalty under West Virginia Code § 46A-6-104. Specifically, CashCall argues that Article 6 does not apply to consumer lending given that it makes unlawful only unfair and deceptive acts taken "in the conduct of any trade or commerce." "Trade or commerce" is defined as the "advertising, offering for sale, sale or distribution of any

23

goods or services . . . ." W. Va. Code § 46A-6-102(6). Therefore, because consumer lending is neither a "good" nor a "service," CashCall contends that § 46A-6-l04 does not apply in this case.

CashCall raises this assignment of error for the first time on appeal. "Our general rule in this regard is that, when nonjurisdictional questions have not been decided at the trial court level and are then first raised before this Court, they will not be considered on appeal." *Whitlow v. Bd. of Educ. of Kanawha Cnty.*, 190 W.Va. 223, 226, 438 S.E.2d 15, 18 (1993). *See also Louk v. Cormier*, 218 W.Va. 81, 622 S.E.2d 788 (2005); *State ex rel. State Farm Mut. Auto. Ins. Co. v. Bedell*, 228 W.Va. 252, 719 S.E.2d 722 (2011).

> The rationale behind this rule is that when an issue has not been raised below, the facts underlying that issue will not have been developed in such a way so that a disposition can be made. . . . Moreover, we consider the element of fairness. When a case has proceeded to its ultimate resolution below, it is manifestly unfair for a party to raise new issues [before this Court]. Finally, there is also a need to have the issue refined, developed, and adjudicated by the trial court, so that we may have the benefit of its wisdom.

*Id.* at 264-65, 719 S.E.2d at 734-35. Therefore, for the foregoing reasons, we decline to address this assignment of error.

### C. Assignments of error relating to the award of attorney's fees as costs

We conclude our analysis by addressing CashCall's five remaining assignments of error (numbers ten through fourteen) relating to the circuit court's award of attorney's fees to the State. With regard to an award of attorney's fees, we have said

> "[t]he decision to award or not to award attorney's fees rests in the sound discretion of the circuit court, and the exercise of that discretion will not be disturbed on appeal except in cases of abuse." *Beto v. Stewart*, 213 W.Va. 355, 359, 582 S.E.2d 802, 806 (2003). *See also Sanson v. Brandywine Homes, Inc.*, 215 W.Va. 307, 310, 599 S.E.2d 730, 733 (2004) ("We . . . apply the abuse of discretion standard of review to an award of attorney's fees."); Syl. pt. 2, *Daily Gazette Co., Inc. v. West Virginia Dev. Office*, 206 W.Va. 51, 521 S.E.2d 543 (1999) ("'"'[T]he trial [court] . . . is vested with a wide discretion in determining the amount of . . . court costs and counsel fees, and the trial [court's] . . . determination of such matters will not be disturbed upon appeal to this Court unless it clearly appears that [it] has abused [its] discretion.' Syllabus point 3, [in part,] *Bond v. Bond*, 144 W.Va. 478, 109 S.E.2d 16 (1959)." Syl. pt. 2, [in part,] *Cummings v. Cummings*, 170 W.Va. 712, 296 S.E.2d 542 (1982) [(per curiam)].' Syllabus point 4, in part, *Ball v. Wills*, 190 W.Va. 517, 438 S.E.2d 860 (1993).").

*Corp. of Harpers Ferry v. Taylor*, 227 W.Va. 501, 504, 711 S.E.2d 571, 574 (2011).

CashCall's tenth assignment of error is that the circuit court erred in awarding the State reasonable attorney's fees as costs absent express statutory or constitutional authority for such an award. CashCall also argues that attorney's fees may not be awarded to the State as costs.

We disagree. The circuit court had express statutory authority to award attorney's fees as costs to the State for its successful prosecution of this enforcement action against CashCall. As we noted above, West Virginia Code §46A-7-108 provides that the Attorney General may bring an action both to restrain an entity from violating the WVCCPA and to obtain "other appropriate relief" which, pursuant to *Imperial Marketing*, is the full array of equitable relief including an award of attorney's fees as costs. 203 W.Va. at 213-14, 506 S.E.2d at 812-13. Further, West Virginia Code § 59-2-18 provides that when the State is granted equitable relief, the "fees of attorneys and other officers for services, and allowances for attendance" shall be taxed as part of the costs.

That said, even if the circuit court had not had express statutory authorization to award attorney's fees as costs, the circuit court would still have had legal authority to do so pursuant to Syllabus Point 3 of *Sally-Mike Properties v. Yokum*, 179 W.Va. 48, 365 S.E.2d 246 (1986), which provides as follows: "There is authority in equity to award to the prevailing litigant his or her reasonable attorney's fees as 'costs,' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." Here, CashCall's actions—such as its refusal to produce the names and contact information for its West Virginia customers and its refusal to produce requested documents in an electronically searchable format—were vexatious and oppressive. Therefore, the circuit court clearly had legal authority to grant the State its attorney's fees as costs both for CashCall's violations of the WVCCPA, and for CashCall's vexatious and oppressive conduct. As such, we find that the circuit court did not abuse its discretion in awarding the State its reasonable attorney's fees as costs.

CashCall's eleventh assignment of error is that the circuit court erred in awarding attorney's fees to the State because, pursuant to *Hechler v. Casey*, 175 W.Va. 434, 333 S.E.2d 799 (1985), the State may not recover attorney's fees where the Attorney General represents the State. In *Hechler*, the Secretary of State filed a petition for a writ of prohibition with this Court. The Court subsequently granted the writ. The State then sought attorney's fees for its work on the case. We found that "the Constitution of this State restricts the compensation of the Attorney General . . . to a strict salary basis and bars the officers from supplementing or increasing their legislatively provided compensation by their receipt of fees or any other form of compensation." *Id.*, 333 S.E.2d at 816. Thus, CashCall contends that the West Virginia Constitution prohibits the circuit court from awarding attorney's fees to the State in this case. However, CashCall fails to note that we also said in *Hechler* that this Court could not award attorney's fees to the Attorney General for its work on behalf of the State *absent statutory authorization for such an award*. As we noted above, in the instant case, West Virginia Code § 46A-7-108 and § 59-2-18 provide statutory authorization for an award of attorney's fees as costs in a case seeking to enforce the WVCCPA. Therefore, *Hechler* does not preclude the award of attorney's fees as costs in this case.

CashCall's twelfth assignment of error is that the circuit court abused its discretion in relying on Assistant Attorney General Norman Googel's non-contemporaneous time estimates in

determining his fees for the time he allegedly expended on this case. CashCall highlights that Mr. Googel's fifty-two "block billing" entries account for eighty-two percent of his claimed 1,175.9 hours of work on the case. CashCall complains that these block entries describe as many as thirty days of work in very few words. Therefore, CashCall contends that Mr. Googel's reconstructed time estimates lacked the accuracy and detail necessary to serve as a reliable predicate for an award of attorney's fees.

The record on appeal shows that Mr. Googel testified at length about the substantial time he spent, and the detailed method he used, to reconstruct time-sheets for this case. Mr. Googel also testified that he likely worked many more hours on the case than he could recall or substantiate. Further, Mr. Davis and the State's expert witness, attorney Bren Pomponio, testified that they believed Mr. Googel's time entry estimates were low in light of the duration and complexity of the case. Importantly, in its March 18, 2013, order, the circuit court noted its concern with the manner in which Mr. Googel's time estimates were reconstructed. The circuit court also found that "block billing" is not favored by the courts. The circuit court then found that Mr. Googel's estimated hours were reasonable in light of the court's knowledge of the history of the case. Nevertheless, the circuit court discounted Mr. Google's hours by fifteen percent for his failure to keep contemporaneous records. In support of its fifteen percent reduction of Mr. Googel's hours, the circuit court cited to several cases where federal courts had reduced attorney's fees' awards to states that prevailed on enforcement actions because the state failed to produce contemporaneous or adequate time-keeping records. *See New York v. Microsoft Corp.*, 297 F.Supp.2d 15 (D. D.C. 2003) (15% reduction); *Michigan v. E.P.A.*, 254 F.3d 1087 (D.C. Cir. 2001) (10% reduction); *Kennecott Corp. v. E.P.A.*, 804 F.2d 763 (D.C. Cir. 1986) (15% reduction). On this record, we cannot say that the circuit court abused its discretion in relying, in part, on Mr. Googel's time entry estimates to determine the award of attorney's fees for his work on this case.

CashCall's thirteenth assignment of error is that the circuit court erred in relying on Bren Pomponio's opinion regarding the reasonableness of the *number of hours* claimed by Mr. Googel and Mr. Davis in this case because Mr. Pomponio was not qualified by the circuit court as an expert on the reasonableness of the number of hours worked in such a case. CashCall argues that Mr. Pomponio's testimony violated Rule 702 of the West Virginia Rules of Evidence which contemplates that a witness who offers expert testimony on an issue must be qualified as an expert on that issue. CashCall contends that the circuit court erred in considering any opinion offered by Mr. Pomponio on the reasonableness of the number of hours billed by Mr. Google and Mr. Davis.

In the order on appeal, the circuit court clearly stated that, although Mr. Pomponio's opinions on reasonable and customary fees and on the reasonableness of hours worked were "helpful," they were not determinative of the court's resolution of those issues. Rather, the circuit court found that the number of hours sought by the State was reasonable based on its application of the twelve-factor test in Syllabus Point 4 of *Aetna Casualty & Surety Co. v. Pitrolo*, 176 W.Va. 190, 342 S.E.2d 156 (1986).[22] In applying the *Aetna* factors, the circuit court

_____

[22]The twelve *Aetna* factors are as follows:

found significant the novel and complex issues in this case; the fact that CashCall attempted to remove the case to federal court; the fact that Mr. Googel could have commanded a higher rate; and the fact that the State did not seek fees for the work done on the case by its paralegals or for assistant attorneys general who worked on the case other than Mr. Googel and Mr. Davis. Therefore, because the circuit court did not base its findings regarding the reasonableness number of hours billed on Mr. Pomponio's testimony, the circuit court neither violated Rule 702 nor abused its discretion in finding that the number of hours billed by Mr. Googel and Mr. Davis was reasonable.

CashCall's fourteenth and final assignment of error is that the circuit court abused its discretion in finding $350.00 to be a reasonable hourly rate for both Mr. Googel and Mr. Davis. First, CashCall contends that Mr. Davis should not have been paid as much as Mr. Googel because Mr. Google had practiced law for thirty-two years, including eighteen years with the Attorney General's Consumer Protection Division, while Mr. Davis had practiced law for only twenty-two years, and had worked at Consumer Protection for only sixteen years. Second, Mr. Googel was the lead attorney on the case. Third, CashCall argues that both attorneys' hourly rate should have been lower at the start of the case in 2007 than it was when the case concluded in 2012, because both attorneys had less experience in 2007 than they did in 2012.

The circuit court found that the $350.00 hourly rate was warranted because both Mr. Googel and Mr. Davis had many years of experience, both were skilled practitioners, and both had obtained an exceptional outcome in a case involving novel and complex issues. We find that the evidence in the record on appeal supports this finding. For example, Mr. Pomponio opined that the $350.00 rate sought by the Attorney General for both attorneys was reasonable, and reasonably could have been higher. Mr. Pomponio also gave numerous examples of similar attorney's fees awards in similar cases. Mr. Googel testified that a circuit court had previously awarded him $350.00 per hour in another matter involving similar issues. Mr. Davis testified he anticipated being awarded $550.00 per hour in an antitrust matter pending in California. Both attorneys testified they believed the rates were reasonable and warranted. Importantly, CashCall failed to introduce any evidence tending to show that the $350.00 hourly rate was unreasonable.

---

> Where attorney's fees are sought against a third party, the test of what should be considered a reasonable fee is determined not solely by the fee arrangement between the attorney and his client. The reasonableness of attorney's fees is generally based on broader factors such as: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Aetna*, 176 W.Va. at 191-92, 342 S.E.2d at 157.

Therefore, we find that the circuit court did not abuse its discretion in concluding that the $350.00 hourly rate for both Mr. Googel and Mr. Davis was warranted.

As for CashCall's claim that the hourly rates for Mr. Googel and Mr. Davis should have been lower at the inception of the case than at the end, we find that the circuit court appropriately awarded fees at current market rates for the pendency of the case given that, while this case was litigated, the State's expenses continued to accrue. As the United States Supreme Court has said,

> ". . . When plaintiffs' entitlement to attorney's fees depends on success, their lawyers are not paid until a favorable decision finally eventuates, which may be years later. . . . Meanwhile, their expenses of doing business continue and must be met. In setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value. . . ."

*Missouri v. Jenkins by Agyei*, 491 U.S. 274, 282 (1989). Based on this reasoning, we find that the circuit court did not err in awarding the same hourly rate for the pendency of this case.

Accordingly, for the foregoing reasons, we affirm all three of the circuit court's extraordinarily thorough and remarkably well-reasoned orders.

Affirmed.

**ISSUED:** May 30, 2014

**CONCURRED IN BY:**

Chief Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II